ROBERT BLOCK *et al.*, Plaintiffs-Appellees, *v.* GEORGE DARDANES *et al.*, Defendants.—(GEORGE DARDANES, Defendant-Appellant.)

First District (5th Division)   No. 79-258

Opinion filed April 11, 1980.

Kusper & Raucci, Chartered, of Chicago, for appellant.

David C. Paulus, of Chicago, for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant George Dardanes, a general partner in a limited partnership known as Wildfire Investments, appeals from an order granting plaintiff, his limited partner, an accounting and judgment for $105,400.54. On review, Dardanes contends that the trial court erred in denying his motion to dismiss at the close of plaintiff's case on grounds that (1) plaintiff failed to establish a prima facie case; and (2) plaintiff "did not come to the court with clean hands."

Many of the essential facts in this case are uncontradicted, inasmuch as defendants called no witnesses to testify. It appears that in January of 1973 plaintiff, a physician, was introduced to Dardanes by a common friend, Tony Dicharinti. Plaintiff and Dardanes became interested in the purchase of the Adria restaurant in unincorporated Lake County, and they entered into a written limited partnership agreement whereby Dardanes, who had experience in the restaurant business and at that time owned and managed the Sir George's restaurant, was the general partner, and plaintiff was the limited partner. The purpose was to finance and operate the anticipated new restaurant and, pursuant to the terms of the agreement, Dardanes was to be responsible for the actual management of the business, including the keeping of partnership records and accounts.

The seller of the Adria restaurant wanted $550,000 for the property— $50,000 of which was required as a down payment; $200,000 of which was to be paid in cash "under the table"; and the partnership was to obtain a mortgage for the remaining $300,000. Plaintiff, Dardanes and Dicharinti each agreed to furnish one-third of the cash needed for the down payment and the "under the table" money, although Dicharinti was not mentioned in the written partnership agreement.

It is somewhat unclear from the record exactly how plaintiff provided his share of the cash. He testified that he promptly gave Dardanes $3,333.33, representing one-third of the $10,000 earnest money; that in order to pay his share of the $200,000 "under the table" money he removed $46,000 in cash from his safety deposit box at the Old Orchard Bank; that he and Dicharinti took this money to his (plaintiff's) house and counted it; that they placed it in an attache case and brought it to Dardanes at Sir George's restaurant; that Dardanes said plaintiff was short by $1,070; that approximately one week later he gave Dardanes two watches (valued at $740) and $330 in cash to make up this deficit; that in order to pay his share of the $50,000 down payment, he withdrew $5,500 from his account at Home Federal Savings and Loan and $3,000 from his account at Continental Illinois National Bank and Trust; that he also sold

some stock for $5,455 and wrote a check payable to "cash" for $4,000; and that he gave these sums to Dardanes. However, plaintiff's wife (Louise Block), who is also a physician and practices with plaintiff, testified that plaintiff originally removed $18,400 from the safety deposit box; that she later witnessed him counting $38,760 in cash, which he had taken from the box; that she gave plaintiff $1,600 from their office account and later gave him an additional $2,000 from office funds to invest in the partnership. Finally, plaintiff's income tax return for 1973 indicates that he invested $21,000 in the business.

In any event, it is clear that the partnership secured a mortgage, under which it was to pay approximately $3,000 per month and, in April of 1973, the purchase of the property was finalized. A corporation (Wildfire, Inc.) was set up as the owner of the business, and plaintiff personally paid $4,000 of a $12,000 charge by an architect who was hired to plan the new restaurant. Plaintiff made 20 to 25 visits to the restaurant before it opened on May 1, 1974, under the name "Wildfire."

Subsequent to the opening, Bruce Block (plaintiff's son), who had worked for Dardanes at Sir George's restaurant, began working at Wildfire and Dicharinti, together with an individual named Frank DeMarie, also became involved. Plaintiff testified that they were considered partners, even though their names did not appear in the limited partnership agreement. Plaintiff also testified that when Dicharinti suggested DeMarie's sons (Frank, Jr., and Salvatore) would be helpful at the restaurant, Dardanes agreed that they should be hired. Plaintiff and his son testified that Salvatore took over the day-to-day management of Wildfire. Plaintiff's son also testified that Sal kept two sets of books—one which was shown to anyone asking information, while the other was "private"; and that he (Bruce) told plaintiff of the two sets of books and reported the actual daily receipts to plaintiff.

It appears evident from the record that Dardanes did not involve himself in the operation of the restaurant to the extent contemplated in the limited partnership agreement. Plaintiff testified that he never saw any income statements of Wildfire Investments; that on several occasions during the period from July to September, 1974, he had requested of Dardanes some indication as to the partnership income, but he never received any such information; and that Dardanes never furnished plaintiff with an accounting.

Dardanes, called to testify under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60), stated that while he was at the Wildfire approximately 10 times in May of 1974, he was never there during the period of June to September, 1974; that he "never operated personally the Wildfire"; that he did not have a key; that he never had anything to do with Wildfire from the beginning; that he never kept the

partnership books; that his inactivity at Wildfire resulted because the DeMaries forcibly took over the business a few months after it opened; that Sal and Frank DeMarie, Jr., threatened his life; and that they and Bruce Block were in total control of Wildfire. On the other hand, plaintiff testified that Frank DeMarie did not threaten him or Dardanes in order to become involved in Wildfire. Bruce Block testified that the relationship between Sal DeMarie and Dardanes was amicable and that he never observed any quarreling between the two, and that he never heard Frank DeMarie, Sr., threaten Dardanes—although, on occasions, one of the DeMaries had kept a revolver in his desk.

Dardanes testified that he tried to render an accounting, stating that he had hired Norman Diamond, an accountant, to do so and that the DeMaries brought various vouchers and receipts to his (Dardanes') home, which he in turn delivered to Diamond. Diamond testified that during the period of May to October 1974, he received books from Dardanes; that he (Diamond) also visited Wildfire and requested and received various documents from Frank DeMarie. It was conceded at the oral arguments here that no accounting was in fact ever completed.

In October 1974 plaintiff filed the instant suit against Dardanes, Sal and Frank DeMarie, Jr., and Wildfire, Inc., seeking essentially a dissolution, accounting, and termination of the limited partnership. Dardanes filed an appearance and answer and, although the DeMaries were served with summons, they did not appear. At trial, plaintiff's witnesses testified as related above and, in addition, Dardanes testified that the restaurant was in serious financial difficulty during the period of June through September 1974; that in November, he orally agreed to sell the premises to an individual named George Christopulous; that under the agreement, Christopulous was to pay the outstanding bills and take over the mortgage; that three or four days after the agreement was reached, Christopulous gave Dardanes $20,000 in cash and later gave him an additional $17,500; that he neither gave nor received a written document of any kind; that the sale was never consummated; and that Christopulous sued him and recovered a judgment of $47,000. The record is not clear as to whether plaintiff was actually apprised of the proposed sale. In any event, Dardanes testified that he did not have to report it to plaintiff since he "seemed to know everything" but that he did in fact tell plaintiff of the sale during a telephone conversation; that plaintiff told him "to go right ahead and sell it" and then hung up on him; that plaintiff refused to talk to him and that he thus never had a chance to tell him that Christopulous had paid $37,500; and that he never gave plaintiff any part of that payment. It also appears from the testimony that a foreclosure suit was filed against the partnership in December 1974 for default of mortgage payments.

Plaintiff also testified that he personally paid many of the partnership

debts, including the mortgage payments for March, April and May of 1974; that he paid the real estate taxes; that he loaned Dardanes $1,500; and that his "out-of-pocket" loss is over $118,000 as a result of the partnership effort.

At the close of plaintiff's case, Dardanes moved to dismiss on the grounds that plaintiff had failed to establish a prima facie case and that he came into court with unclean hands. The motion was denied, and Dardanes chose to stand on the motion and not introduce any evidence in his behalf. A default judgment order was then entered against the DeMaries for $105,400.54 and, subsequently, the court entered judgment against Dardanes in the same amount, with findings that plaintiff paid $105,400.54 to Dardanes in reliance upon his representations that it would be used in furtherance of the partnership; that Dardanes failed to fully and fairly account to plaintiff; that Dardanes failed to perform the duties and obligations incumbent upon him as general partner; that Dardanes failed to manage the business and thereby caused a waste of the assets of the partnership; and that there is due and owing from Dardanes the sum of $105,400.54. The trial court then entered a final order consolidating the two judgment orders, stating that Dardanes and the DeMaries were to be held jointly and severally liable for the amount of the judgment. Dardanes' motion for a new trial was denied, and this appeal was from the judgment against him.[1]

OPINION

■■ The seminal question here is whether the trial court erred in denying Dardanes' motion to dismiss at the close of plaintiff's evidence. In order to address this issue properly, we would first point out that the briefs of both parties center on the question of whether plaintiff was entitled to an "accounting." However, in view of the fact that plaintiff was apparently awarded the return of his capital contribution, it appears that at the request of plaintiff, the trial court in fact ordered a dissolution of Wildfire, followed by an accounting and termination. We find it proper for a trial court to grant all such relief in a single action. See *Rudnick v. Delfino* (1956), 140 Cal. App. 2d 260, 294 P.2d 983; 60 Am. Jur. 2d *Partnership* §270 (1972).

■ Dissolution is defined in the Uniform Partnership Act as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." (Ill. Rev. Stat. 1977, ch. 106½, par. 29.) Under the Uniform Limited Partnership Act, a limited partner has the same rights as a general partner to have dissolution and winding up by decree of court. (*Curtis v.*

---

[1] The default judgment against the DeMaries is not before this court, and it appears that no service of process was ever had on Wildfire, Inc., the other named defendant.

*Johnson* (1968), 92 Ill. App. 2d 141, 234 N.E.2d 566; Ill. Rev. Stat. 1977, ch. 106½, par. 53.) Such decree of dissolution may be sought under the numerous circumstances set forth in section 32 of the Uniform Partnership Act. (Ill. Rev. Stat. 1977, ch. 106½, par. 32.) Section 32(d), which is relevant here, allows dissolution whenever:

> "A partner wilfully or persistently commits a breach of the partnership or agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him," (Ill. Rev. Stat. 1977, ch. 106½, par. 32(d)).

(Also see 60 Am. Jur. 2d *Partnership* §191 (1972).) Furthermore, a limited partner has the right to a formal account of partnership affairs whenever circumstances render it just and reasonable (Ill. Rev. Stat. 1977, ch. 106½, par. 53), and failure to account is grounds for an order of dissolution (*Fisher v. Fisher* (1967), 352 Mass. 592, 227 N.E.2d 334; *Schroer v. Schroer* (Mo. 1952), 248 S.W.2d 617).

Thus, the question presented is whether the trial court erred in denying Dardanes' motion to dismiss at the close of plaintiff's case because plaintiff failed to make out a prima facie case for dissolution. We note that such motions are provided for in section 64 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 64), which directs that the trial court "shall weigh the evidence" in passing on the motion. However, there has been considerable confusion in the past as to whether this provision requires the trial court to consider the evidence in the light most favorable to plaintiff. This matter was recently clarified by the Illinois Supreme Court in *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57-58, 349 N.E.2d 399, 407-08, where it said:

> "[W]e wish to clarify the procedure that a reviewing court is to follow in reviewing a decision of a trial court granting a judgment in favor of the defendant. The plaintiff cites *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill. 2d 494, for the proposition that directed verdicts should be granted only in cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick* involved a trial before a jury, however, and is therefore significantly distinguished from the instant case. The *Pedrick* rule was designed to prevent a trial judge from assuming the duties of the trier of fact in a jury case. In a trial without a jury, however, the trial judge is the trier of fact, and the *Pedrick* rule is not applicable. In a case tried without a jury, the trial court is to weigh the evidence when a defendant moves for judgment at the close of the plaintiff's case. (Ill. Rev. Stat. 1973, ch. 110, par. 64(3).) In ruling on the defendant's motion for judgment, therefore, the

judge had the duty to pass on the credibility of the witnesses and consider the weight and quality of the evidence. In weighing the evidence, the court had the responsibility to consider all the evidence, including any favorable to the defendant. The court was not to consider the evidence in the light most favorable to the plaintiff. Consequently, we will not reverse the decision of the trial court unless that decision is contrary to the manifest weight of the evidence."

To harmonize and coordinate section 64(3) of the Civil Practice Act with the supreme court decision, the second sentence of section 64(3) of the Civil Practice Act was amended by Public Act 81-270 to read as follows: "In ruling on the motion the court shall weigh the evidence, *considering the credibility of the witnesses and the weight and quality of the evidence.*"

In applying the above law to the facts of the instant case, we note that under the terms of the written limited partnership agreement, Dardanes was responsible for the operation and management of the restaurant. However, plaintiff testified that he never received any income statements for the partnership and, although he requested of Dardanes some indication of the partnership income several times during the period of July to September, 1974, the information was never provided. On his section 60 examination, Dardanes testified that he was never at the restaurant during the period of June to September 1974; that he did not keep books; that he did not have a key to the premises; and that he never had anything to do with Wildfire from the beginning. Further, plaintiff testified that he personally paid some of the partnership debts and also loaned money to Dardanes. In view of the above testimony that Dardanes failed to render an accounting when requested and that he persistently breached the partnership agreement, we feel the evidence tended to establish a cause of action for dissolution.

We see no merit in any of the arguments made by Dardanes in support of his contention that plaintiff failed to establish a prima facie case. He first points out that he hired Diamond in order to satisfy plaintiff's demand for an accounting. We find this unpersuasive, however, in view of the fact the Dardanes' attorney admitted at the oral arguments in this case that no statements or results of any accounting were ever given to plaintiff.

Second, Dardanes refers us to his section 60 testimony that he could not manage the partnership affairs as required in the agreement because of the DeMaries' hostility toward him, and he urges that this testimony destroyed plaintiff's prima facie case for dissolution. Dardanes testified that he read the partnership agreement and understood his responsibilities under it and that he had been to the restaurant about ten times in May, but

was not there in June, July, August and September, 1974, although he did pay some liquor bills in July and August. Dardanes also stated that the DeMaries had taken over the operation of the restaurant, and he was afraid to do anything in connection with it because they had threatened his life. We note, however, that there was other testimony indicating that this alleged animosity between Dardanes and the DeMaries did not exist. Specifically, plaintiff testified that Frank DeMarie did not threaten him or Dardanes in order to become active in the restaurant, and Bruce Block testified that the relationship between Sal DeMarie and Dardanes was amicable and that he never observed any quarreling between the two. Since the trial court was required to consider all the testimony, we cannot agree with Dardanes that a prima facie case was not established because of his testimony that he was prevented from managing the restaurant. Furthermore, Dardanes' counsel admitted at oral arguments that Dardanes was nevertheless charged with the obligations of a general partner up until the time the DeMaries allegedly took over the restaurant a few months after it opened. His inactivity during this initial time, without anything else, tended to establish neglect of his partnership obligations.

■ Third, Dardanes appears to argue that a prima facie case was not shown because the testimony concerning the amount plaintiff invested in the partnership is questionable. We see no merit in this argument which is grounded in the assertion that the trial court was bound to accept the figure of $21,000 listed on plaintiff's income tax return as conclusive proof of the amount he expended. In support, Dardanes cites *Flannery v. Flannery* (1943), 320 Ill. App. 421, 51 N.E.2d 349. In that case, five plaintiffs filed suit against defendant for a determination of the interest which all the parties possessed in a partnership. There was no written agreement controlling their interests; however, for a period of 18 years, the partnership tax returns indicated that 7/12 of the profits was allocated to defendant and 1/12 to each of the plaintiffs. Further, defendant's individual returns indicated a 7/12 interest in the partnership, and plaintiffs were aware that their interests had been reported in that manner. The court held that defendant was entitled to 7/12 of the profits and plaintiffs to 1/12 each, explaining that "[p]artnership agreements, as to the division of profits, may be express or implied from the acts, transactions and previous conduct of the copartners in respect thereto." (320 Ill. App. 421, 431, 51 N.E.2d 349, 354.) We do not view *Flannery* to be controlling here. In that case, the court found an implied agreement as to the relative interests of the partners arising from the manner in which the partnership returns were completed over an extended period of time, and there is no indication that any contrary evidence was presented for the court to consider. In the instant case, however, the trial court was not

inferring an agreement from conduct extending over many years but was attempting to determine the amount of money plaintiff had expended in a short period of time, and there were several sources presented at trial from which that determination could be made. We reject the contention that the trial court could not look to figures other than those represented on plaintiff's income tax return in the ascertainment of the amount expended by him.

Alternatively, Dardanes suggests that a prima facie case was not shown because the differing testimony of plaintiff and his wife leaves a question as to the amount invested. He apparently urges that the state of the account is in such doubt and uncertainty that it is impossible to do justice between the parties and that the trial court should have dismissed the suit for want of equity. (See *Donaldson v. Donaldson* (1908), 237 Ill. 318, 86 N.E. 604.) He points out that plaintiff testified he removed $46,000 from his safety deposit box; whereas Louise Block stated that plaintiff counted $18,400 which he withdrew and later an additional $38,760. While we recognize the possible discrepancy here, we must emphasize that we are concerned only with the question whether the evidence tended to establish a prima facie case. In light of the testimony recounted above concerning Dardanes' failure to carry out his obligations as a general partner, we cannot say that this apparent inconsistency as to the amount plaintiff withdrew from his safety deposit box would have required the trial court to grant Dardanes' motion to dismiss.

Fourth, Dardanes asserts in his brief that he cannot be held liable for the losses of the partnership where there is no showing of fraud or bad faith. We note, however, that plaintiff is not seeking to hold defendant liable for the partnership losses; but, rather, is seeking in essence repayment of the funds he contributed as a limited partner. Dardanes' entire line of argument in this regard is thus irrelevant.

We turn then to the contention of Dardanes that the trial court should have granted his motion to dismiss because plaintiff "did not come to the court with clean hands." He points out that plaintiff testified he participated in paying the seller of the restaurant a portion of the purchase price "under the table" and that plaintiff was aware of the fact that Sal DeMarie kept two sets of books. We are not persuaded, however, that plaintiff's conduct in this regard prevented him from obtaining the equitable relief granted. We recognize that "[i]t is a fundamental rule that one seeking equitable relief cannot take advantage of his own wrong or, as otherwise stated, he who comes into equity must come with clean hands." (*Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904, 908, 369 N.E.2d 498, 501.) However, as stated in *Mascenic v. Anderson* (1977), 53 Ill. App. 3d 971, 972, 369 N.E.2d 172, 173:

"We deem it well settled that misconduct on the part of a

plaintiff which will defeat a recovery in a court of equity must have been conduct in connection with the very transaction being considered or complained of, and must have been misconduct, fraud, or bad faith toward the defendant making the contention." (Also see *Metcalf v. Altenritter; Illinois Power Co. v. Latham* (1973), 15 Ill. App. 3d 156, 303 N.E.2d 448.) In addition, application of the doctrine of unclean hands is a matter for the sound discretion of the trial court. *Bonner v. Westbound Records, Inc.* (1977), 49 Ill. App. 3d 543, 364 N.E.2d 570; *Cahokia Sportservice, Inc. v. Illinois Liquor Control Com.* (1975), 32 Ill. App. 3d 801, 336 N.E.2d 276.

In the case at bar, while the conduct to which Dardanes points may have been an attempt to conceal data from the Internal Revenue Service, there is nothing in the record to indicate that it was directed toward Dardanes, and we accordingly hold that the trial court did not abuse its discretion in refusing to deny plaintiff recovery on the basis of unclean hands.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.