BERNARD M. SUSMAN *et al.*, Plaintiffs-Appellees, *v.* CYPRESS VENTURE *et al.*, Defendants-Appellants (Donald Asher *et al.*, Counterplaintiffs-Appellants, *v.* Bernard M. Susman *et al.*, Counterdefendants-Appellees).

First District (3rd Division)   No. 81—1219

Opinion filed December 30, 1982.—Rehearing denied May 31, 1983.

RIZZI, J., concurring in part and dissenting in part.

William J. Harte, Ltd., Kevin M. Forde, Ltd., and Sperling, Slater & Spitz, all of Chicago (William J. Harte, Kevin M. Forde, and Bruce S. Sperling, of counsel), for appellants.

Greenberger, Krauss & Jacobs, Chartered, of Chicago (James T. Ryan and Brian P. Lutterman, of counsel), for appellees.

JUSTICE McGILLICUDDY delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook County which dissolved five partnerships and ordered that the assets of the partnerships be liquidated. The five partnerships are Cypress Venture, Cedar Venture, Red Bud Venture, Catalpa Venture and Osage Venture.

In October 1968 Bernard Susman and related entities (hereinafter Susman) and members of the Asher family and related entities (hereinafter Ashers) entered into a partnership to purchase and develop approximately 945 acres of property in Lake County, Illinois. Five partnership agreements (hereinafter agreement), the terms of which are essentially identical, defined the rights and obligations of the partners thereof.

In the agreement Donald, Gilbert and Robert Asher were designated as "general partners"; Susman was designated as a "limited partner." Norman Asher, who was not a party to the agreement, guaranteed the performance of his sons.

The purpose of the partnerships was "to acquire, own, operate, maintain and lease the Real Property and the improvements made thereon and, as an investment, to develop, construct, own, operate, maintain and lease or otherwise sell the Real Property, in whole or in part, and the improvements made thereon, and to engage in such operations necessary or appropriate to the foregoing purposes."

Pursuant to the terms of the agreement, Susman was responsible for the management and development of the property. The Ashers were given the right to make all decisions for the partnership until such time as their capital was returned or until Susman contributed an equal amount of capital. Any profits generated were first to be distributed to the Ashers, until their capital contribution plus imputed interest was returned, and thereafter the profits were to be divided equally between the Ashers and Susman.

The basic dispute between the parties concerned whether the partnership intended to develop the residential portion of the property (approximately 800 acres). It is Susman's position that in 1969 and 1970 he formulated a development plan, to which the Ashers agreed, involving a sale of a portion of the property to a residential user who would bring in water, sewer and roads at the user's expense. Such a plan would benefit the partnership since the partnership could then use these facilities to develop the remaining property.

The Ashers, on the other hand, contend that it was the intention of the parties from the inception of the partnership to develop the residential property. They assert that they did not invest over $2.3

million in order to permit Susman to earn half the profits by merely arranging a sale of the property. They further contend that Susman violated the agreement by failing to act as a developer.

After the property was acquired, the Ashers, with the concurrence of Susman, rejected various offers to purchase the property in its entirety. In 1972, advertisements were placed in the Wall Street Journal seeking users for the property. In 1973, Susman began negotiations with the Rossmoor Corporation, a developer of retirement communities, concerning the possible sale of a portion of the property. According to Susman, he and Norman Asher negotiated extensively with Rossmoor. However, the proposal was rejected. According to the Ashers, Susman did virtually nothing with respect to the property after this rejection.

In August 1974, a meeting occurred in the office of Norman Asher. The parties disagree as to what occurred at the meeting. According to Susman, Norman Asher announced that Susman had "too good a deal" and that he was no longer a partner. The Ashers, on the other hand, contend that Susman asserted at the meeting that it was not his responsibility to do anything other than arrange a sale of the property and insisted that the Ashers agree to the Rossmoor proposal.

The partnership property had been placed in land trusts with the Schaumburg State Bank as trustee. Gilbert Asher and Susman jointly possessed the power of direction for said trusts. Pursuant to a "Declaration of Nomineeship," Gilbert Asher and Susman acknowledged that they held the beneficial interest in said trusts only as nominees for the partnership and that they would "deal and treat" with the beneficial interest "as and only as and when directed" by the partnership.

On September 20, 1974, the Ashers sent a letter to Susman instructing him to execute certain directions to the trustee which would result in the transfer of the partnership property to another entity. It is undisputed that Susman would not have received a power of direction in the new land trust to be created. Susman refused to act. On September 27, 1974, the Ashers wrote Susman informing him that "by virtue of your failure to execute and deliver the directions to Schaumburg State Bank as requested *** you have defaulted under your agreements ***. These defaults are in addition to other previous defaults by you contrary to and in violation of your covenants, representations, and commitments in said five Venture agreements." The notice did not identify these "previous defaults."

In 1976 the Ashers filed a lawsuit against the Schaumburg State

Bank in which they sought an order compelling the bank to assign the property to new entities. On May 26, 1976, the Ashers were granted judgment on the pleadings.

On May 28, 1976, Susman filed this action in which, among other allegations, he contended that the Ashers arbitrarily and capriciously refused to agree to develop the property in the manner he recommended and that the Ashers refused to deal with him as a partner. In their answer the Ashers affirmatively asserted that by his conduct, Susman had repudiated his obligations and thus abandoned the partnership. Subsequently, the Ashers filed a counterclaim in which they asserted that Susman's conduct not only constituted a repudiation and abandonment of the agreement but that his conduct had damaged the partnership.

On April 28, 1978, Judge John F. Hechinger ruled on a motion to dismiss Susman's complaint and a motion for summary judgment filed by the Ashers. Judge Hechinger found that the Ashers had not acted unreasonably in rejecting Susman's proposals to sell the property or had interfered with Susman's performance of his obligations under the agreement. The court further found that it could not, on a ruling for summary judgment, declare as a matter of law that Susman had or had not performed all of his duties under the agreement and, therefore, the agreement was still in full force and effect. The court ordered the Ashers to provide Susman with any documents required to be made available to him under the agreement.

In regards to the Ashers' counterclaim against Susman, Judge Hechinger found that Susman had not been properly served with notice of default and, therefore, the counterclaim was dismissed without prejudice.

Despite the commencement of the litigation, Susman continued his efforts to find a purchaser. In 1977, he procured an offer from the Zale Construction Company (Zale) to purchase the property. The Ashers indicated that they might consent to a sale of a portion of the property. In March 1978, Zale made a formal offer to purchase which was rejected by the Ashers. Thereafter, Susman notified the Ashers of his intention to invoke the "buy-out" provision of the agreement. This provision stated that if a partner obtained a "bona fide offer to purchase" the partnership's property and tendered it to the partnership, then the other partners had to either buy out that partner's interest for cash or accept the "bona fide offer." The Ashers rejected this demand because they believed that the Zale proposal was not a "bona fide offer." However, in August 1978, the Ashers sold a portion of the property to Zale without Susman's participation. Subsequently,

Susman amended his complaint to add a count alleging a breach of the "buy-out" provision.

This matter proceeded to trial before Judge Albert Green on Susman's third amended complaint and the Ashers' amended counterclaim. Following the presentation of extensive evidence, Judge Green found that the conduct of the Ashers constituted an expulsion and "freeze-out" of Susman from the partnership. Said conduct included serving Susman with a notice of default, telling him that he was no longer a partner, removing his name from the partnership tax returns, and refusing to provide him with access to partnership books, records and information. The court further found that the Ashers' failure to accept or match the Zale offer constituted a breach of the agreement. The court also found that the Zale offer was a "bona fide offer" under the terms of the agreement.

On April 3, 1981, the court ordered the dissolution and winding up of the partnership, an accounting, and a judicial sale of the partnership property. In addition, the court stated that Susman was entitled to damages consisting of the amount he would have realized from the Zale offer ($645,000) or his share of the proceeds from the judicial sale, whichever sum was larger. It is from this order that the Ashers appeal.

I

The Ashers first urge this court to hold, as a matter of law, that Susman's refusal to develop the residential property constituted a repudiation of the agreement and an abandonment of his interest in the partnership. They contend that the agreement unambiguously provided for a broad and intensive effort at development by Susman. For example, article III-section 3.1 entitled "Management and Development" provided:

> "*** the management of the affairs and activities of the Partnership in connection with the development or construction of building and structures and all appurtenances thereto on the Real Property, including the building and construction of all industrial and commercial buildings, residential areas, shopping centers, highways and road net works, sewer, water and power systems and apartment houses, as an investment of the Partnership, shall be in Susman. Susman covenants and agrees that, upon the prior written request and approval of the General Partner, Susman will do, accomplish, complete or cause to be done, accomplished and completed for and on behalf of the Partnership any or all of the following with respect to the de-

velopment and construction of the Real Property, as an investment of the Partnership.''

In addition, section 3.2 provided:

"After completion of all or substantially all of the development and construction of all or a portion of the Real Property (herein the "Completed Projects"), the management of the affairs and activities of the Completed Projects shall be in the General Partner and, except as otherwise expressly provided herein, all decisions affecting Completed Projects shall be made by the General Partner."

■ Although it is clear that the parties certainly contemplated the possibility of residential development, we cannot say as a matter of law that the agreement unambiguously required it. As we have previously pointed out, the purpose of the partnership was "*** to develop, construct, own, operate, maintain and lease *or* otherwise sell the Real Property, in whole or in part ***." (Emphasis added.) The agreement did not require the parties to perform all these options. Pursuant to section 3.1, the Ashers were to give Susman written notice of those activities they wished accomplished with respect to the property.

In the alternative, the Ashers contend that the trial court's finding that Susman did not breach the agreement by disclaiming his responsibility to develop the residential property was erroneous. Whether a party has breached a contract is a question for the trier of fact. Its finding on this issue will not be disturbed unless it is contrary to the manifest weight of the evidence. *B & C Electric, Inc. v. Pullman Bank & Trust Co.* (1981), 96 Ill. App. 3d 321, 421 N.E.2d 206; *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.

The Ashers insist that despite their oral instructions to the contrary, Susman consistently maintained that his only responsibility with respect to the residential property was to obtain a purchaser for it. Susman, however, presented conflicting evidence in this regard. Susman testified that he formulated a development plan involving the sale of the residential property. He asserted that not only did the Ashers agree with his plan, they assisted in its implementation by negotiating with Rossmoor and placing advertisements for a sale in the Wall Street Journal. Susman further points out that it is undisputed that the Ashers never delivered to him any written instructions concerning the development pursuant to section 3.1 of the agreement. He also denied the Ashers' assertion that they gave Susman oral instructions to develop the residential property.

■ In nonjury cases, the credibility of the witnesses and the weight afforded their testimony are questions to be determined by the trial court. (*Shanahan v. Schindler* (1978), 63 Ill. App. 3d 82, 379 N.E.2d 1307.) In the instant case, the trial court heard conflicting evidence as to which party breached the agreement. We cannot say that the trial court's decision to believe Susman's account of his relationship with the Ashers and its conclusion that Susman did not repudiate the agreement were against the manifest weight of the evidence. Thus, the trial court's finding in this regard will not be disturbed.[1]

## II

The trial court found that the Ashers breached the agreement by expelling Susman from the partnership and that their actions made it impracticable to carry on the business of the partnership. Pursuant to the Illinois Uniform Partnership Act (Ill. Rev. Stat. 1979, ch. 106½, par. 32(1)(d)) a court shall order the dissolution of a partnership when "a partner wilfully or persistently commits a breach of the partnership or agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him." The Ashers contend that their alleged breaches were not serious enough to warrant dissolution of the partnership.

■ After considering all the evidence, the trial court concluded that the Ashers treated Susman as if he had no interest in the partnership. The court found that the Ashers told Susman that he was no longer a partner; altered the partnership tax returns to indicate that Susman's interest was zero; excluded Susman from partnership business; denied him information concerning the activities of the partnership; and refused to account for partnership expenses. We cannot say that the trial court's conclusion that these actions necessitated dissolution was erroneous. When the relations existing between partners render it impracticable for them to conduct business beneficially, dissolution is proper. (*Mandell v. Centrum Frontier Corp.* (1980), 86 Ill. App. 3d 437, 407 N.E.2d 821.) Furthermore, failure to account to a partner is grounds for an order of dissolution. *Block v. Dardanes* (1980), 83 Ill. App. 3d 819, 404 N.E.2d 807.

■ The Ashers also contend that the question of their alleged

---

[1]The Ashers also contend that if this court accepts Susman's testimony that he never intended to develop the residential property, then they are entitled to have the agreement rescinded because its plain and unambiguous terms evidence a contrary representation by Susman. However, as we have previously discussed, the agreement did not plainly require the development of the residential property.

breach of the agreement was decided against Susman by Judge Hechinger in his order of summary judgment. Judge Hechinger found that the Ashers had not "in any way wrongfully interfered with plaintiffs in the performance of their duty under the contract or have unreasonably rejected or interfered with any development plans or proposals for the sale of the property by plaintiffs." We do not believe, however, that this holding precluded a later finding that the Ashers breached the agreement in a manner other than interfering with Susman's performance. As we have previously discussed, Judge Green found that certain actions constituted an expulsion from the partnership. Such a finding was not contrary to a prior controlling judgment, as the Ashers assert.

## III

■ The Ashers next allege that the trial court erred in finding that the Ashers' refusal to accept or meet the Zale proposal breached the "buy-out" provision of the agreement. Pursuant to this provision, the Ashers had the right to force the partnership to make a sale of property, sale of real property or a sale of improvements. In contrast, Susman only had the right to force the sale of property. Section 1.5 of article I of the agreement defines the following terms:

> "(a) The term 'Real Property' shall mean the portion of real property acquired, described in, and forming the subject matter of the Real Estate Agreement.
> ***
> (c) The term 'Property' shall mean the Real Property, all improvements made thereto and all other properties and assets of the Partnership."

It is undisputed that the real estate which was the subject of the Zale offer to purchase property was for unimproved land. According to the definitions in the contract, this land was "real property." Pursuant to the buy-out provision Susman could not force a sale of "real property." Therefore, Susman had no right to force the Ashers to accept the Zale offer to purchase real property, and the trial court's finding in this regard was erroneous. Therefore, that portion of the judgment which awarded Susman money damages in connection with the Ashers' refusal to accept or match the Zale offer must be reversed.[2] The judgment is affirmed in all other respects.

---

[2]In view of this holding, it is unnecessary for us to consider the Ashers' arguments that the Zale proposal was not a "bona fide offer" and that the money judgment was improper.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part, reversed in part.

WHITE, P.J., concurs.

JUSTICE RIZZI, concurring in part and dissenting in part:

While I agree with the majority that the judgment of the trial court should be affirmed regarding the issues of breach of the agreement and dissolution of the partnership, I dissent from the majority's decision to reverse that portion of the judgment awarding damages due to the Ashers' refusal to accept or match the Zale offer.

The majority acknowledges that the trial court carefully considered the evidence and evaluated the credibility of the witnesses in deciding that Susman did not breach the agreement and that dissolution of the partnership was the appropriate remedy. I believe that the trial court gave this same careful consideration to the issues relating to the Zale offer, and since the decision of the trial court regarding these questions was not against the manifest weight of the evidence, it should be affirmed.

In construing an agreement, the primary objective is to determine and give effect to the intention of the parties at the time they entered into the contract. (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 697, 427 N.E.2d 585, 587.) The intention of the parties must be gathered from the contract as a whole and not merely from any clause standing alone. (*Goldblatt Brothers, Inc. v. Addison Green Meadows, Inc.* (1972), 8 Ill. App. 3d 490, 495, 290 N.E.2d 715, 717-18.) If the trial court determines that the agreement is ambiguous, then parol and extrinsic evidence are admissible to explain and ascertain what the parties intended. (See *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 744, 365 N.E.2d 1028, 1032.) While the issue of whether or not an ambiguity exists is a question of law (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 697, 427 N.E.2d 585, 587), where an ambiguity has been found and the extrinsic evidence is in conflict, a fact question is presented for determination by the trier of fact. See *Storybook Homes, Inc. v. Carlson* (1974), 19 Ill. App. 3d 579, 582-83, 312 N.E.2d 27, 29.

Here, the trial court permitted extrinsic evidence to be introduced at trial. This evidence was contradictory in material respects. In finding that under the terms of the agreement the Ashers were required

to match or accept the Zale offer, the trial court weighed the evidence relating to this issue and found the weight of the evidence to be in favor of Susman and against the Ashers.

Since the buy-out provision, when construed as part of the agreement as a whole, admits of more than one interpretation, I believe the trial court properly admitted and considered extrinsic evidence on the issue. The testimony regarding the buy-out provision was important to a determination of the parties' intent under the agreement. The intent of the parties was a factual question to be determined by the trier of fact. A reviewing court will not substitute its judgment as to the credibility of witnesses for that of the trier of fact who had the opportunity to see and hear the witnesses, unless the findings of the trier of fact are contrary to the manifest weight of the evidence. (*Riemer Brothers, Inc. v. Marlis Construction Co.* (1978), 64 Ill. App. 3d 80, 83, 380 N.E.2d 1160, 1163.) Here, the record does not demonstrate that the trial court's finding that the Ashers were required by the buy-out provision to match or accept the Zale offer is against the manifest weight of the evidence. Therefore, the finding should not be disturbed.

For the same reasons, I believe that the trial court's finding that the Zale offer was a *bona fide* offer under the agreement should also be upheld. The record demonstrates that the trial court was fully apprised of the substance of the Zale offer, and the record does not establish that the trial court's finding that the offer was a *bona fide* offer is against the manifest weight of the evidence.

Since I believe that the trial court's judgment awarding Susman money damages on the basis of the Zale offer and the buy-out provision of the agreement should be affirmed, I will address the related issues raised by the Ashers.

The trial court awarded Susman as damages the amount he would have realized under the Zale offer ($645,000) or his share of the proceeds from a judicial sale, whichever sum is larger. The Ashers contend that this was error because the trial court should have forced an election of remedies by Susman. However, the doctrine of election of remedies is applicable only in instances where the plaintiff would otherwise receive a double recovery, or the defendant has actually been misled by the plaintiff's conduct, or *res judicata* can be applied. (*District 141, International Association of Machinists & Aerospace Workers v. Industrial Com.* (1980), 79 Ill. 2d 544, 550-51, 404 N.E.2d 787, 789.) Here, Susman would not receive a double recovery since the two measures of damages are alternative rather than additive. Also, the evidence and the findings of the trial court establish that the Ashers

were not misled, and *res judicata* is plainly not applicable. Thus, there is no basis for applying the doctrine of election of remedies to the present case.

In addition, since the trial court entered judgment in favor of Susman on the merits, fairness dictates that Susman should not be compelled to make an election as to the damages he is to receive before the alternative amounts are determined. Otherwise, it may cause an unjust result to the prevailing party and a benefit to the party against whom judgment was entered on the merits. On this same point, the Ashers' additional contention that the trial court's judgment is speculative simply because it provides for alternative relief is also untenable. All that the judgment requires is that Susman choose between the alternative damages once the judicial sale is completed. Merely because the judgment gives Susman the right to choose between damages does not mean that the judgment is speculative.

The Ashers also argue that the amount of the money judgment is excessive because the trial court determined the damages as of April 24, 1978, rather than October 1, 1978. The Ashers' argument is based on the premise that the Zale proposal, if accepted by the Ashers, was to have closed on August 1, 1978, and that thereafter the partnership would have had to wind up its affairs and distribute its assets pursuant to the agreement, which means that Susman would not have received his *pro rata* share until approximately October 1, 1978. The Ashers' argument is without merit because the trial court properly concluded that Susman was entitled to payment for his partnership interest as of the date when the Ashers breached the agreement, which under the facts occurred as of the expiration of the Zale offer on April 24, 1978. The Ashers also argue that the trial court's award of damages was excessive because no partnership expenses were deducted from the prospective Zale proceeds. However, the amount of damages was a factual question to be determined by the trier of fact based upon the evidence offered at trial by the respective parties. Here, the Ashers do not point to any specific evidence that was offered at trial which resulted in a miscalculation by the trial court in its determination of the amount of the damages.

The Ashers next contend that the trial court improperly awarded Susman prejudgment interest because "the time when the Ashers should have paid Susman the amount due cannot be precisely determined; and the amount due is not subject to precise computation." However, as previously stated, the trial court properly determined that the breach occurred as of April 24, 1978. Therefore, the damages, including prejudgment interest, were properly calculated as of

680

that date. It follows from this fact, plus the fact that the trial court properly determined the amount of the judgment to be $645,000, that the amount due is subject to precise computation.

Accordingly, I believe the judgment of the trial court should be affirmed in its entirety.