GUST K. NEWBERG, INC., Plaintiff-Appellant, v. THE ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Defendant-Appellee.

Second District   No. 2—86—0262

Opinion filed March 31, 1987.

Louis A. Lehr, of Arnstein, Gluck, Lehr, Barron & Milligan, and Edward M. White, Eugene J. Kelley, Janis M. Gibbs, and Nancy Andjich, all of Carey, Filter, White & Boland, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Robert T. O'Donnell, Richard E. Friedman, and Roland A. Eckert, all of Epton, Mullin & Druth, Ltd., of Chicago, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

This action was brought by a joint venture of Gust K. Newberg Construction Company, Krug Construction Company, and Brighton Building and Maintenance Company (Newberg) seeking to recover damages arising from the alleged breach of two construction contracts by the Illinois State Toll Highway Authority (Authority). The court, sitting without a jury, entered judgment for defendant. We affirm.

In 1971, the Authority undertook to extend the East-West Tollway west from Aurora to Rock Falls. The bid documents provided that work would start on section 8-AB on or about August 2, 1971, and on section 7-AB on or about August 9, 1971. Newberg submitted its bid on July 20, 1971, to perform the work in section E-8AB and on July 27, 1971, to perform the work in section E-7AB. These sections involved approximately 23 miles of roadway. Newberg was awarded a contract on each bid. Contracts were executed on August 6, 1971.

Notice to proceed under each contract was given August 11, 1971. When Newberg was given notice to proceed, however, no right-of-way was obtained in section 7. Several parcels became available about a week after the notice to proceed was issued, but as of September 3, 1971, Newberg did not go forward with its planned work because the available parcels were not contiguous. On September 20, 1971, Newberg considered there were a sufficient number of contiguous parcels so that it could start its operations in section 7B. Thereafter, the Authority continued to obtain right-of-way from time to time for various parcels.

In the meantime, Newberg discovered that some farmers had not been paid for damage which was to be done to the growing crops. Some farmers refused access to Newberg. Newberg notified the Authority of this situation, and the Authority advised Newberg to stay off the property until it had settled the farmers' crop claims. The Authority's procedure for settling crop claims was to send a representative to each farmer and negotiate a settlement. A check would be requested and, thereafter, hand delivered to the farmer.

A third problem allegedly impeded Newberg's progress in section 7. This was in an area known as Union Ditch. The Union Ditch property consisted of several parcels of land within the Union Ditch Drainage District (District), which adjoined the tollway right-of-way on the north for 2½ miles. As part of the construction of the tollway, a ditch was to be built by Newberg on the north side of the right-of-way to collect water and channel it to Union Creek, where it would flow under the tollway. Certain parcels within the Union Ditch area were ac-

tually part of the right-of-way, but additional property was also affected. Substantial excavation was required in an easement area north of the ditch itself. The right of entry in this area was obtained on October 21, 1971.

The last parcels for right-of-way in section 7 became available October 22, 1971.

The Authority gave Newberg notice to proceed in section 8 on August 11, 1971. In this section Newberg proceeded slowly and eventually halted its work, claiming that the public utility interferences were impossible to work around.

Newberg worked from September 20, 1971, only until December 5, 1971. By working far fewer days than it had anticipated, Newberg fell behind its own schedule for 1971.

Newberg resumed working in the spring of 1972. Work was slow due to inclement weather. But, as of July 19, 1972, it appeared that Newberg's efforts would be successful. On that date, a project manager wrote to the Authority that paving operations would not be delayed and that the contractor was simply awaiting a dry period of approximately four days in order to initiate fine grading and allow the beginning of paving. In spite of these efforts, however, Newberg did not make up more lost time because of extraordinary weather conditions throughout 1972.

In 1973, Newberg was confronted with a nationwide cement shortage which made the obtaining of cement in any significant quantities impossible. Therefore, completion of the roadway was deferred until 1974.

The cumulative effect of the foregoing delays resulted in heavy damages to Newberg. On September 18, 1974, Newberg submitted a written claim for delay damages asserting that construction was delayed by the Authority's lack of diligence. Newberg proposed a settlement of $2.75 million which was initially accepted by the Highway Authority Board but ultimately rejected by the Attorney General. (See *Newberg-Krug-Brighton v. Illinois State Toll Highway Authority* (1978), 63 Ill. App. 3d 780, *appeal denied* (1979), 72 Ill. 2d 583; *Gust K. Newberg v. Illinois State Toll Highway Authority* (1982), 103 Ill. App. 3d 557, *aff'd* (1983), 98 Ill. 2d 58.) A six-week trial ensued.

Concerning the section 7 right-of-way issue, Newberg introduced evidence to show that when the notice to proceed was given to Newberg on August 11, 1971, no right-of-way whatsoever had been obtained in section 7. While several parcels became available about a week later, as of September 3, 1971, Newberg did not go forward with the work because the available parcels were not contiguous.

Newberg also contended that even though certain rights-of-way were acquired by the Authority, Newberg was not able to work on those parcels because of standing crops. As a result of the delays in acquiring rights-of-way and the delay in settling for crop damages, gaps were created in the right-of-way preventing any effective movement by Newberg of its earth moving equipment until September 20, nearly 40 days after the notice to proceed.

Newberg also complained of the Authority's failure to timely acquire right-of-way parcels in section 7 in the Union Ditch drainage area. Newberg contended that the Authority should have taken it upon itself to acquire the property rather than proceed along its plan by which it entered into an agreement with the District allowing it to acquire the property from the property owners. Newberg challenged that delay was further occasioned by the Authority's failure to perform certain engineering regarding the ditch.

Finally, Newberg complained that arrangements had not been completed for the relocation of utilities crossing the tollway in many critical right-of-way areas in section 8.

Concerning Newberg's right-of-way complaints, the Authority responded at trial by both relying on contract provisions which placed the burden on the bidder to consider possible right-of-way delays and by introducing evidence that showed that the Authority acted with all diligence in acquiring right-of-way parcels.

The Authority contended that Newberg understood its obligation to acquaint itself with the status of right-of-way acquisition at the time it submitted its bid and to be aware of any right-of-way parcels yet to be acquired and the possibility of delay in acquiring them. Special provision No. 114 of the parties' contract provided:

> "Each bidder is instructed to fully acquaint himself with the status of the right-of-way acquisition at the time of the submission of his bid and the possibility of the acquisition of the parcels remaining to be acquired, if any, in time so as not to interfere with the progress of his work under this contract, and the Authority shall not be liable to any damage that may occur to him for any and all delay, expense or for any other cause that may occur to him or be occasioned by him or any of his subcontractors through delay of the Authority in securing the necessary right-of-way.
>
> The Authority agrees that it will make every effort to acquire any real property not acquired at the time of the submission of the bids and required for the completion of the work with all speed and diligence possible."

Newberg was familiar with this type of contract provision from its work on other Authority construction projects. The record reflects, however, that none of Newberg's project coordinators or its vice-president for construction made inquiry into the status of right-of-way acquisitions before Newberg submitted its bids. A condemnation suit for 18 parcels in section 7 was first filed on the day before Newberg's bid was submitted. Condemnation suits for the remaining parcels were not filed until after Newberg submitted its bid. At the preconstruction meeting of August 10, 1971, Newberg was promised that 18 of the 42 right-of-way parcels in section 7 would be available within a week to 10 days. As promised, on August 19, 1971, 18 parcels in that section were made available.

The Authority tendered evidence to show that the Authority made every effort to acquire the remaining right-of-way parcels with all speed and diligence. The Authority's right-of-way acquisition expert opined that it would reasonably be expected to take 60 to 90 days from the date of a condemnation suit until an order vesting title in the Authority was obtained. The Authority obtained title to all parcels in section 7 within 60 days of filing the suits.

Concerning the delays surrounding the Union Ditch property, we note that the Authority negotiated an agreement with the local drainage District. This occurred a week before Newberg submitted its bid. The agreement provided that the District would acquire property for the ditch and give an easement to the Authority. The District's expert testified as to the detail and procedure the District was required to follow in acquiring property for the ditch, and he maintained that the District acted as quickly as possible. Furthermore, expert evidence was offered which tended to demonstrate that Newberg's assertion that it could not do earthwork on the right-of-way in the area of the Union Ditch until the property for the ditch became available was illusory. The expert explained that industry practice for doing earthwork in this type of area is to excavate on a 1° slope, thereby allowing any accumulating water to flow downhill and out of the work area. This simple procedure would have allowed Newberg to work on the right-of-way parcels before the property for the ditch was available.

Concerning the complaints as to the alleged crop damage delays, the Authority's expert testified that the Authority employed the proper procedure to settle crop claims and used that procedure as expeditiously as possible.

Concerning Newberg's complaint that the Authority failed to relocate public utility interferences in both sections with all speed and diligence, the Authority's expert disagreed that the Authority should

have caused relocation through condemnation proceedings. His testimony was that the condemnation process would have further delayed relocation of the interferences. Taking public utility property by condemnation requires a hearing before the Illinois Commerce Commission and, even then, the work of relocating the interference is done by the public utility company or its contractor. By the time Newberg submitted its bids, the Authority had already notified the utility companies of each interference and had provided detailed engineering drawings for each of the interferences, enabling preparation of a relocation design and cost estimate. The Authority contended that not only was its manner of dealing with the utility companies reasonable, but it took extraordinary steps to expedite relocating of utility interferences, including permitting the utility companies to proceed on a time-and-material basis without letting the work out for competitive bids, authorizing the companies to do overtime work without prior approval from the Authority, and expediting the approval of the cost estimates and relocation design by foregoing prior engineering department review. Furthermore, the Authority tendered evidence to show that neither roadway nor bridge construction was delayed by the utility interferences.

Finally, the Authority elicited testimony and offered evidence which tended to show that it was Newberg's own lack of diligence and inefficiency which caused its delays. While Newberg's vice-president testified that Newberg should have had its equipment fully mobilized within two weeks of the issuance of the notice to proceed, he admitted that Newberg did not begin earthwork in section 8A until September 9—a month after receiving the notice to proceed and three weeks after virtually all of the 13 miles of right-of-way in section 8AB became available. Newberg's project manager testified that Newberg was unable to start earthwork in section 8 earlier because it had insufficient earthmoving equipment on the scene. The Authority tendered exhibits of daily field reports from field inspectors which made no mention whatsoever of delays caused by lack of right-of-way, but rather reported delays caused by large earthmoving scrapers repeatedly breaking down and remaining out of service for days.

Finally, the Authority tendered evidence to show that Newberg's conflicts and lack of coordination with its fellow joint venturers and subcontractors contributed greatly to its own delay. One of Newberg's project managers testified that he was delayed in working in section 7 because Newberg never properly obtained permission from the Chicago & Northwestern Railroad to build a temporary crossing to carry earthmoving equipment over its tracks, in spite of its contractual obli-

gation to do so. He also testified that Newberg lost 500 man-days due to a shortage of engineers available to operate construction equipment. This was attributable to financial problems experienced by the Krug and Brighton companies.

Newberg quantified its damages resulting from the delays. The damages were presented on an element-by-element basis with thousands of pages supporting the data. Fifteen areas of damage were listed. The damages were based on the determination made by Newberg's project manager, construction bookkeeper, and others at the jobsite in 1971 and 1972. Newberg's damage methodology varied between various elements of the claim, depending upon the available information and the generally accepted manner of calculating damages in the construction industry. Newberg chose to prove its damages by a method of estimating damages known as the "total cost" method. Newberg's project manager testified repeatedly that Newberg's methodology was reasonable and acceptable in the construction industry and that he knew no other way of calculating the damages. The total damages suffered by Newberg, determined by combining all of the elements, was $7,934,730. Newberg's bookkeeper testified that Newberg's costs in excess of receipts came to $6,879,834.30, without regard to anticipated profit.

The Authority offered the testimony of William J. Palmer, a construction accounting expert from Arthur Young Company. His analysis and audit of Newberg's claim demonstrated that the formula prepared by Newberg was unreasonable, inaccurate, and inconsistent. Palmer testified that in order to use the "total cost" method rather than the "discrete method" to compute delay damages, the claimant must first show the actual and proposed cost calculations are correct and reasonable, must next show that the owner is responsible for all of the delay incurred, and must further show that there is not a more reliable method by which to prove delay damages, i.e., that the use of the "discrete method" is impossible. Palmer testified that Newberg's financial records were more than adequate to have priced the delay on a discrete basis if the period of delay were identified. He stated that, compounding the problems created by Newberg's inconsistent base periods for proposed costs of various job elements, the proposed costs themselves were computed inaccurately. As to other elements of Newberg's claim, Palmer showed certain proposed costs were calculated in a way to inflate claim damages.

The trial court, in a well-reasoned letter of opinion, identified 17 factors which caused delay in the construction of sections 7AB and 8AB as follows: (1) tardy notice to proceed; (2) slow mobilization of

equipment; (3) tardy acquisition of remaining right-of-way; (4) supervisory disagreements between joint venturers as to who would control; (5) contractor's refusal to deviate from the original plan in order to stay on production schedule; (6) crop damage claims, with farmers refusing access; (7) utility interferences and tardy relocations; (8) lack of coordination between contractor and subcontractor Schless; (9) cold weather in December 1971; (10) wet weather in spring and summer 1972; (11) shortage of operating engineers; (12) insufficient type and amount of equipment; (13) failure to promptly obtain borrow pits; (14) failure to obtain temporary crossing over railroad tracks; (15) cement shortage, 1973; (16) equipment breakdowns; and (17) financial problems experienced by the joint venturers during the course of construction.

The trial court concluded that the Authority had caused Newberg some delay and that Newberg did suffer some damages which were reasonably and proximately the result of those damages. The court recognized, however, that the contract provision put the plaintiff on notice as to the lack of right-of-way. The court observed that three times during the course of the construction contract, Newberg admitted that it could get back onto its production schedule by working additional shifts or adding men and equipment. The court stated: "It was the Plaintiff's mistaken belief, however, even as late as July 1972, that it could get back on schedule without taking any extraordinary measures which obviously would destroy the efficiency of the Plaintiff's plan and also eliminate any hope of a profit." Finally, the court concluded that the methodology of the plaintiff in computing the damages was inappropriate for this case.

On February 24, 1986, the court found the issues in favor of the Authority and entered judgment for the Authority and against Newberg. On March 21, 1986, Newberg timely appealed the February 24, 1986, order praying that the judgment be reversed and the cause remanded for a new trial.

On appeal, Newberg presents two issues for our court to review: (1) whether the Authority breached its contract with Newberg and, if so, the proper measure of damages; and (2) whether the court ruled correctly in refusing to admit certain deposition testimony into evidence at the trial.

Concerning its first issue, Newberg argues that the trial court erred in setting a lower standard of diligence for the Authority and in finding that the Authority had used all speed and diligence under that standard. The court compounded this error by placing a burden on Newberg to expend extraordinary funds to overcome the delay and by

requiring Newberg to use an impossible method of calculating damages.

The Authority responds that special provision No. 114 of the contracts between Newberg and the Authority dictates that the Authority would not be liable for damages caused by its own delay in acquiring right-of-way parcels. Furthermore, the Authority contends that the trial court's finding that it had used every effort to acquire all property with speed and diligence was supported by the evidence and that Newberg had an obligation to mitigate its damages occurred by any delay.

■■ Whether a party has breached a contract is a question presented to the trier of fact, and its finding will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*Susman v. Cypress Venture* (1982), 114 Ill. App. 3d 668, 674.) For a judgment to be against the manifest weight of the evidence, it must appear that conclusions opposite to those reached by the trier of fact are clearly evident. (*South Shore Amusements, Inc. v. Supersport Auto Racing Association* (1985), 136 Ill. App. 3d 284, 287.) We find that the trial court's findings and judgment for the defendant are not against the manifest weight of the evidence.

Special provision No. 114 of the contract between Newberg and the Authority supports the trial court's holding that Newberg was not entitled to damages for delay under the facts in this case. Newberg contends that special provision No. 114 requires that the contractor inquire about the status of right-of-way acquisition at the time he submits his bid and warns him that the Authority will not be liable for damage which might be occasioned by the delay of the Authority up to that date. Newberg concludes that it "appear[s] that [special provision No. 114] was intended to protect the Authority from claims for damages for its shortcomings up to the date of its submission of bids." We do not agree.

■■ Where terms of contract are clear and unambiguous, they will be given their natural and ordinary meaning. (*Wil-Shore Motor Sales, Inc. v. Continental Illinois National Bank & Trust Co.* (1984), 130 Ill. App. 3d 167, 172.) In the instant case, we think, as did the trial court, that the language of the contract is plain and the meaning unambiguous. It creates in the contractor a duty to examine the status of the right-of-way acquisition at the time it bids the project and must take into account the possibility of additional right-of-way acquisition. It clearly states that the Authority will not be liable to the contractor for damages caused by *any* delay in acquiring the right-of-way. Finally, it binds the Authority to make every effort to acquire any real

property not acquired at the time of the submission of bids with all speed and diligence. Furthermore, the construction of the contract proposed by Newberg misconstrues the language of the contract since any delay by the Authority prior to the bid of a contractor would not result in any damage to the contractor.

While such a clause seems onerous to us, we recognize that Illinois courts have consistently given effect to such clauses. (*Bates & Rogers Construction Corp. v. Greeley & Hansen* (1985), 109 Ill. 2d 225; *Herlihy Mid-Continent Co. v. Sanitary District* (1945), 390 Ill. 160; *Ryan Co. v. Sanitary District* (1945), 390 Ill. 173; *Underground Construction Co. v. Sanitary District* (1937), 367 Ill. 360; *M. A. Lombard & Son Co. v. Public Building Com.* (1981), 101 Ill. App. 3d 514; *Bates & Rogers Construction Corp. v. North Shore Sanitary District* (1980), 92 Ill. App. 3d 90.) The only recognized exception to the enforceability of a no-damages-for-delay clause occurs where there is an allegation of bad faith or gross negligence. *Bates & Rogers Construction Corp. v. Greeley & Hansen* (1985), 109 Ill. 2d 225, 232.

Newberg contends that *Bates & Rogers Construction Corp. v. North Shore Sanitary District* (1980), 92 Ill. App. 3d 90, and *Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087, support the general rule that a contractor can recover damages for the acts of the owner that hinder performance of the work. The inapplicability of these cases is demonstrated by the relevant quote in *Consumers Construction Co.*: "[W]e hold that where the owner bears responsibility for delay, the contractor has an action against the owner for such damages as reasonably and proximately resulted from the delay; subject to the applicable provisions of the contract." (1 Ill. App. 3d 1087, 1094.) Special provision No. 114 is the applicable provision of the contract which exempts the Authority from the normal responsibility for delay.

In *Bates & Rogers Construction Co. v. Greeley & Hansen* (1985), 109 Ill. 2d 225, the supreme court reviewed the validity of no-damages-for-delay clauses. The court reaffirmed its long-standing policy to enforce such clauses and barred the contractor's claim, reasoning:

"Bates & Rogers agreed to the exculpatory clause, and undoubtedly the price which it bid for the project reflected the possibility that delays could occur. We therefore hold Bates & Rogers to the plain words of the bargain it made. See *Underground Construction Co. v. Sanitary District* (1937), 367 Ill. 360, 371 ('the parties themselves have provided' the answer to delay-damages claim); *Unicon Management Corp. v. City of Chicago* (7th Cir. 1968), 404 F.2d 627, 631 ('The City bargained

for the right to delay \*\*\*')." 109 Ill. 2d 225, 231.

As stated above, the only recognized exception to the enforceability of a no-damages-for-delay clause is an allegation of bad faith or gross negligence. (109 Ill. 2d 225, 232.) At this point we note that Newberg's contention that the trial court set a lower standard of performance for the Authority is unsupported by a full examination of the record. More importantly, Newberg made no allegations that the Authority was guilty of bad faith or gross negligence in its acquisition of right-of-way parcels. The trial court made no such finding, and our review of the record does not reveal any bad faith or gross negligence. Therefore, special provision No. 114 is clearly enforceable and precludes Newberg from seeking damages incurred by the delay of acquiring any right-of-way parcels.

Newberg cites several cases which, it claims, are analogous to the facts in the instant case and which would support a finding of gross negligence on the part of the Authority. (See *Abbett Electric Corp. v. United States* (Ct. Cl. 1958), 162 F. Supp. 772; *Peter Kiewit Sons' Co. v. United States* (Ct. Cl. 1957), 151 F. Supp. 726; *Chalender v. United States* (Ct. Cl. 1954), 119 F. Supp. 186; *City of Dallas v. Shortall* (Tex. Civ. App. 1935), 87 S.W.2d 844.) We find these cases distinguishable on the facts.

■ In the instant case, there was sufficient evidence to support the trial court's express finding that the Authority "proceeded as expeditiously as it could to try to solve the right-of-way, the utility relocations and crop damages claims as they developed." The notice to proceed was issued on August 11, 1971. Newberg's project manager concluded in a post-construction analysis of the earthwork that as of August 11, 1971, "At this time, we had sufficient R.O.W. [right-of-way] to make a good start." Furthermore, the project manager testified that Newberg did not have sufficient earthmoving equipment to begin earthwork until September 9, 1971.

Concerning the manner in which the Authority handled the farmers' crop claims, we cannot say that the trial court's finding that the Authority used every effort to acquire all property with all speed and diligence was unsupported by sufficient evidence. The record reflects that to the extent standing crops were part of the realty, they were taken by quick take. Where the crops were mature, they were considered to be personalty, and claims were handled by prompt negotiations.

Finally, concerning the relocation of the utility interferences, we note that there was conflicting evidence as to whether Newberg could have cushioned over subterranean utility lines and whether it could

have worked underneath aerial utility lines. There was also evidence that Newberg had failed to complete earthwork planned during 1971 because it had insufficient construction equipment in those areas that were available to it. An examination of the record reflects that while the public utility company was solely responsible for the removal and relocation of the interferences, the Authority took several steps to expedite the relocation of the interferences, including permitting the utility to proceed on a time-and-materials basis without letting the work out for competitive bids, authorizing the utilities to do overtime work without prior approval from the Authority, and expediting the approval of cost estimates and relocation design by foregoing prior engineering department review. Finally, we note that Newberg's project manager testified that his ability to make progress on the roadway construction was not delayed by utility interferences and that Newberg itself advised the Authority in July 1972 that it could complete the project on schedule.

The trial court's finding that the Authority had not breached the parties' contract was not against the manifest weight of the evidence. We, therefore, need not address whether Newberg used an improper method of calculating its damages. We do, however, need to address Newberg's contention that the trial court improperly disallowed part of the evidence deposition testimony of Joseph Simpson (Simpson), a former employee of Newberg.

■ During the course of trial, the Authority served notice on Newberg that it desired to take the evidence deposition of Simpson. (Both parties had already taken his discovery deposition.) After a motion to quash was denied by the court, counsel went to New Jersey, where the deposition was taken. After the Authority had interrogated Simpson, and cross-examination had commenced, objection was made by the Authority that the cross-examination was going beyond the scope of the direct examination. Newberg's counsel stated that to the extent the questions went beyond direct examination, the deposition would be deemed the evidence deposition taken on behalf of Newberg. At trial, the court refused to permit the deposition to the extent taken on behalf of Newberg. Newberg made an offer of proof showing that the testimony elicited from Simpson was in connection with notice to the Authority regarding interferences from farmers because of crop damage claims, the effect of the failure to relocate utility interferences, Newberg's approach to the overall job, and Newberg's reasonableness in excavation and paving work. Newberg contended that pursuant to Supreme Court Rule 206(b) (103 Ill. 2d R. 206(b)) it was entitled to use the testimony which exceeded the bounds of the Au-

thority's direct examination. We disagree.

We agree with Newberg that a separate notice of deposition need not have been given by Newberg, but we disagree that it was appropriate for Newberg to cross-examine Simpson beyond the bounds of the direct examination without first concluding the Authority's examination. Our research shows that no case has directly confronted this question. However, in an evidence deposition the examination and cross-examination shall be the same as though the deponent were testifying at trial. (103 Ill. 2d R. 206(c)(2).) Cross-examination is limited to subjects covered in direct examination, because other subjects would not be relevant. (*People v. Weinstein* (1965), 66 Ill. App. 2d 78, 99.) The proper procedure for Newberg's counsel to have followed would have been to limit his scope of cross-examination and, after concluding his cross-examination, proceed to examine the witness directly. In any case, having found that special provision No. 114 limited any delay damages absent bad faith or gross negligence, Simpson's testimony was irrelevant, since it did not point to any bad faith or gross negligence on the part of the Authority.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.