John J. CURLEY, James Karanfilian and Duane Roberts, individually and on behalf of Brignoli Curley & Roberts, Associates, a Delaware limited partnership, Plaintiffs,

v.

BRIGNOLI CURLEY & ROBERTS ASSOCIATES, a limited partnership, Brignoli & Curley Inc. and Richard Brignoli, Defendants.

No. 88 Civ. 5307 (MP).

United States District Court, S.D. New York.

Aug. 4, 1989.

See also, 128 F.R.D. 613.

**1210**

Fulbright Jaworski & Reavis McGrath, New York City (Glen Banks and James Nespole, of counsel), for plaintiffs.

Welsh & Katz, Chicago, Ill. (Robert Breisblatt, of counsel) and Law Offices of Arie E. David, New York City (Arie E. David and Michael E. Plank, of counsel), for defendants.

## OPINION AND DECISION

MILTON POLLACK, Senior District Judge.

### Overview

This phase of the litigation between the parties seeks the equitable intervention of this Court in a partnership dispute. Plaintiffs, limited partners, claim defendants, the General Partner and its Chief Executive Officer, breached their fiduciary duties, misappropriated and mismanaged and misused partnership assets and facilities.

John J. Curley, James Karanfilian and Duane Roberts, limited partners of Brignoli, Curley & Roberts Associates ("BCR"), a Delaware partnership, sue for removal of the corporate General Partner or alternatively dissolution of BCR, an accounting and damages arising from various breaches of fiduciary duty to BCR and its limited partners. They name as defendants (1) Brignoli & Curley, Inc. ("BCI"), the General Partner of BCR and a Delaware corporation; (2) BCR as a necessary defendant; and (3) Richard Brignoli, the principal shareholder and Chairman and President of Brignoli Models, Inc. ("BMI"), a limited partner of BCR; Brignoli is also Chief Executive Officer and President of BCI.

Jurisdiction of this Court is posited on diversity of citizenship and requisite amount in controversy.

The corporate General Partner, BCI, and defendant Brignoli, denied liability and asserted an assortment of affirmative defenses as well as counterclaims for damages in favor of the partnership against those limited partners who are plaintiffs herein, for their alleged fiduciary and contractual breaches as such limited partners. In addition, the General Partner, BCI, asserted on behalf of the partnership, so-called "counterclaims" against third-parties, for damages arising from alleged misperformance of contractual obligations of the latter to the partnership.

Jury and non-jury issues were thus posed and the third-party "counterclaims" were bifurcated and were tried to a jury. A verdict of no liability in favor of the counterclaim-defendants was returned by the jury. Final judgment was entered thereon.

Thereafter, the principal claims asserted in the complaint as well as the defenses thereto, were tried at a Bench trial with the use of the record made before the jury. The counterclaims of the defendants against the plaintiffs were set apart to await a determination of whether there would be a dissolution of the partnership as demanded in the complaint and heard in the accounting among the partners to follow.

At the conclusion of the Bench trial, the Court finds as fact that inadequacy of legal remedies and irreparable harm have been adequately demonstrated and that it is not reasonably practicable or equitable to carry on the business in conformity with the BCR Partnership Agreement. *See* Del.Code tit. 6, § 17–803 (1985 Interim Supp.).

Briefly:

Richard Brignoli, who, late in 1987, assumed the title of Chief Executive Officer of the corporate General Partner, has been guilty of and has caused BCI to be guilty of such crass and autocratic conduct in the service of his selfish interest and in derogation of the interests of the limited partnership so as to affect prejudicially the carrying on of the business as a partner-

ship. There are myriad facts and circumstances in evidence which warrant a Court of equity to remove the General Partner and to install in its place a receiver until the limited partners of BCR can determine whether they wish to continue the business under a trusteeship or to dissolve the business and have an accounting as the equitable solution of the controversy herein.

The evidence adduced at trial amply established glaring misconduct by Brignoli and BCI. The limited partners were denied access to the partnership books and records and the assets of BCR were grossly misused by BCI and Richard Brignoli, including the misuse and pledge of a $175,000 certificate of deposit ("CD") owned by BCR as security for a bank loan to pay the bills of BMI, an entity controlled by Richard Brignoli of which he is Chairman and President and principal owner. BCI and Richard Brignoli have attempted to confuse and cloud the facts of their administration of the partnership with extravagant countercharges and criticisms of the business practices of the limited partners-plaintiffs. These are merely part and parcel of the mistaken notion that Richard Brignoli was not accountable to anyone in his autarchical control of BCI and the affairs of the BCR partnership.

The incriminations and recriminations as between the partners cannot offset or cause us to overlook the abuse of the partnership assets and the bad faith of and excesses to which Richard Brignoli has gone to the detriment of the interests of the other partners.

For the reasons shown hereafter, an interlocutory judgment installing a receiver for BCR to conduct the business pending a vote of the limited partners other than BMI whether to continue or dissolve the business, will be ordered herein. In the event dissolution is ordered thereafter, the counterclaims asserted by the present General Partner, BCI, in its pleading can then be considered to the extent appropriate in the accounting to follow. If no dissolution is to be ordered, a trustee can pursue such counterclaims as are not precluded by the judgment on the jury's verdict on the issues resolved in the jury trial.

### I. The Background

#### A. The Parties

BCR is a Delaware limited partnership with its principal place of business at 15 West 39th Street in New York City. BCR was formed in 1984 in order to engage in the business of providing investment advisory and management services, investment and merchant banking and securities placements. (BCR Partnership Agreement, § 1.4) There are thirteen limited partners.

The General Partner of BCR is BCI, a Delaware corporation whose principal place of business also is in New York City. The shareholders of BCI are Richard Brignoli, as trustee, and John Curley. Brignoli owns 50.1% of BCI's stock and Curley owns 49.9%. Under Section 2(b) of the BCI Shareholders' Agreement, Brignoli serves as Chairman of the BCI board of directors which "shall at all times consist of a majority of directors designated by Brignoli."

Brignoli Models Inc. ("BMI"), is a 54% investor in the BCR limited partnership. BMI is owned by approximately ten stockholders of whom Richard Brignoli is the majority stockholder. BMI develops and markets computer programs for trading securities. BCR licensed the Excess Growth System Program from BMI for trading equity portfolios. As of September 2, 1987, BCR had successfully marketed Excess Growth under the leadership of John J. Curley as CEO to approximately twenty pension fund clients for whom BCR was managing over $1.2 billion in assets using Excess Growth.

#### B. Undisputed Matters

Curley acted as CEO and President of BCI, the General Partner, from October 1, 1984 to October 1, 1987, pursuant to a written employment agreement between himself and BCI. Curley managed the BCR partnership during that period and together with others he employed were largely responsible for the phenomenal growth of BCR during the next three years. BCI through Curley, hired Roberts

on September 11, 1984 to serve as the director of marketing for BCR. Roberts also received an equity interest in BCR. From October, 1985 through January, 1988 BCR also through Curley, employed Karanfilian as an investment officer also with an equity interest in BCR. Curley, Roberts and Karanfilian collectively held approximately 36% of the equity of BCR.

From 1985 through the present, BMI was also a limited partner of BCR and held approximately 54% of its equity. Nine other limited partners hold the remaining equity of BCR together with BCI which holds 1%. The value of each plaintiff's limited partnership interest exceeds $10,000.

On October 1, 1984 Curley on behalf of BCR entered into a licensing agreement with BMI to market a computer program designed by BMI. The computer program was called Excess Growth.

The Excess Growth system produced on a trade blotter a list of trades of securities which were to be accomplished on a daily basis. The consolidated trade blotter contained the name of the security, the number of shares to be bought or sold, and a "limit" price for the shares to be bought or sold for BCR's client portfolio.

It was not anticipated that all of the trades designated by the blotter would be completed each trading day.

Each night, the Excess Growth computer program automatically recalculated and adjusted the portfolios. The program recalculated the appropriate mix of securities to be held in the portfolio by taking into account the dollar status of the portfolio as it existed at the conclusion of the previous day's trades. Only those trades which were called for on the new daily blotter were to be executed.

Some time during the summer of 1985 Curley began using Richard Bennett to do the trades called for by the daily blotter. Curley had known Bennett for a number of years. On or about June 9, 1985 Bennett formed Brick Securities, Inc. ("Brick"). BCR hired Brick and Brick's principal, Richard Bennett, to provide supervisory and trading functions for all of BCR's trading activities on behalf of BCR's clients.

Brick was a licensed broker. Curley, Roberts, Karanfilian and Brignoli later became limited partners in Brick. Curley acted as the supervisor of the trades that Brick was performing for BCR.

### C. *Disputes Among the Partners*

Beginning in or about June of 1987, disputes arose between Curley and Brignoli. Brignoli chose not to license BCR to market a new BMI program named Index Plus. Curley was keenly interested in obtaining those rights for BCR.

About the same time, Brignoli, after allegedly receiving complaints about Brick's performance, began to investigate Brick's trading in September 1987. According to Brignoli, further investigation in October of 1987 disclosed a "huge backlog" at BCR of transactions listed on the trade blotters that had not been executed. In November of 1987, Brignoli expressed his interest in having firms other than Brick execute the trades for BCR. Curley opposed this idea.

Meanwhile, the BCI Board of Directors held a meeting on November 23, 1987. Prior to the meeting, Curley stated that he could not attend a meeting until December 1. The BCI board had never before met when Curley was unable to attend.

At the November 23 meeting, the "board" of BCI—Brignoli, Mr. Debe (Brignoli's uncle) and Mr. David (Brignoli's attorney)—adopted resolutions that: (a) gave Brignoli control over what broker would execute commission trades for BCR clients; (b) allowed Laurence Goldfein an attorney and business associate of one of the principals of Intervest, to be hired as an administrative consultant; and (c) appointed Brignoli to replace Curley as Chief Executive Officer of BCI.

Brignoli thereafter engaged BMI to produce "Stock Sleuth," a program designed to evaluate the effectiveness of a securities trader. He used Stock Sleuth purportedly to investigate the source of the BCR trading backlog. BMI billed BCR for huge costs for developing Stock Sleuth and conducting the related "investigation," without

the approval of the limited partners or the BCI board of directors.

After the "investigation" was completed, Brignoli called a meeting with Curley, Bennett, Roberts and Karanfilian held in Brignoli's office December 11, 1987 purportedly for explanations. The charade over, later that day, Brignoli unilaterally dismissed Bennett and Brick as traders for BCR and he proceeded with what clearly was his plan all along. On the same day, December 11, 1987, Brignoli directed all BCR trading to be executed by Intervest, an entity in which Brignoli indirectly had a substantial interest. On December 18, 1987, the BCI board of directors at Brignoli's instigation, voted not to renew Curley's contract of employment and to relieve him of all duties with respect to BCI and BCR.[1]

Karanfilian voluntarily left BCR in January 1988. Roberts was fired in March 1988. Curley, Karanfilian and Roberts have since started a new money management firm, Cornerstone Asset Management, L.P., which they currently operate.

### D. *The Law Suit*

This action was commenced on July 29, 1988. Plaintiffs claim defendants breached their fiduciary duties to BCR and its limited partners because (1) Brignoli, BCI and BCR refused them access to the books and records of BCR, (2) Brignoli used a BCR CD for $175,000 to secure a bank loan to BMI, from proceeds of which he paid BMI bills, (3) Brignoli authorized huge payments to BMI for "trading audit services" and "trading cost analysis" which were not necessary or for the benefit of BCR, and (4) Brignoli operated BCR in bad faith and in an autocratic manner to benefit himself and his controlled companies at the expense of BCR. Plaintiffs seek removal of BCI as General Partner, or, alternatively, dissolution of BCR and an accounting. They further seek compensatory damages on their derivative claim brought on behalf of BCR against Richard Brignoli.

Defendants asserted six affirmative defenses: (1) lack of subject matter jurisdiction, (2) failure to first demand relief from BCR before bringing suit on plaintiffs' derivative claim, (3) lack of standing on the part of plaintiffs to sue on behalf of BCR, (4) failure to state claims upon which relief can be granted, (5) that the payments to BMI were necessary and reasonable, and (6) that plaintiffs have unclean hands.

In third-party claims (denominated by them as counterclaims), Brignoli on behalf of BCR and BCI claimed Brick and Bennett had caused a backlog in trading that, in turn, caused under-performance in the portfolios managed by BCR. A jury absolved Brick and Bennett of any liability on the issues raised by Brignoli in these third-party claims.

Using BCR as a claimant, BCI and BMI had mingled their third-party claims against Brick and Bennett with their counterclaims against the BCR limited partners. The counterclaims against the limited partners were set apart by the Court to be considered at a later date. Those counterclaims associated the plaintiffs-limited partners with Brick and Bennett's alleged malperformance and misconduct, and demanded damages from the limited partners on behalf of BCR.

The counterclaims referred to above are as follows:

*1st Claim* (against Brick Associates): Breach of Contract with BCR. Relief Sought: $20 million damages.

*2nd Claim* (against Brick Associates, Bennett, Curley, Karanfilian, and Roberts): Interference with Contract. Relief Sought: $30 million damages.

*3rd Claim* (against Brick Associates, Brick Partners, Bennett, Curley, Karanfilian, Roberts): Interference with Con-

---

1. At this time, the BCI board consisted of Brignoli, his uncle, his attorney (all BMI shareholders) and Curley. Curley cast the lone vote for renewal. Curley's employment contract with BCI had expired in October of 1987. He had continued his employment without a contract. This created a hiring at will after October 1987. Defendants, throughout the trial attempted to make much of this "non-renewal" characterization. Curley was then fired by Brignoli on December 18, 1987.

tract. Relief Sought: $30 million damages.

**4th Claim** (against Curley): Breach of Contract with BCI. Relief sought: $30 million damages.

**5th Claim** (against Curley and Roberts): Defamation and Trade Disparagement. Relief Sought: $20 million damages.

**6th Claim** (against Bennett, Curley, Roberts, and Karanfilian): Negligence. Relief Sought: $10 million damages.

A jury trial was held from June 6 through June 12, 1989, which focused on the counterclaims against Brick and Bennett although the plaintiffs were also charged therein. A Bench trial was held on the equitable issues from June 12, 1989 through July 10, 1989. Defendants had moved in advance of the trial for partial summary judgment, the motion being returnable at the commencement of the trial. The motion sought dismissal of plaintiffs' first claim for relief (removal of the General Partner or dissolution of the partnership), and an order directing plaintiffs to surrender their interests in BCR to defendants in return for payment. The Court took no action on the motion other than to try the issues posed in the Bench trial.

## II. *Diversity Jurisdiction*

Jurisdiction herein is posited on diversity of citizenship and the requisite amount in controversy. Defendants claim diversity was destroyed because plaintiff Roberts and defendant Brignoli are both citizens of Connecticut. The complaint had asserted that Brignoli was a citizen of New York. A decision of a Judge of this Court had so found in another case.[2] Brignoli claimed a change of residence since that finding. If there was anything to Brignoli's assertion that he had moved from New York to Connecticut just before this suit, the diversity matter was completely cured when Roberts, a proper but unnecessary limited partner-plaintiff was dropped from the suit before plaintiffs rested plaintiffs' case. Fed. R.Civ.P. 21.

**2.** *Brignoli v. Balch, Hardy & Scheinman, Inc.,* 696 F.Supp. 37, 42 (S.D.N.Y. Oct. 4, 1988)

## III. *The Claims for Equitable Intervention*

The applicable legal principles and the claims of the plaintiffs which warrant equitable relief are as follows.

One standing in a fiduciary relation with another is liable to the other for harm resulting from a breach of fiduciary duty arising from the relationship. Restatement of Torts (Second) § 874. "Although there is no set formulation of the fiduciary duties of partners, the main elements of the obligations owed by one partner to another have been defined as 'utmost good faith, fairness, loyalty.'" *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1078 (2d Cir.1977) (quoting Crane and Bromberg, *Law of Partnership,* § 68 at 390 (1968)), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). *See also Boxer v. Huskey Oil Co.,* 429 A.2d 995, 997 (Del.Ch. 1981).

A partner is prohibited from self-dealing during the duration of the partnership and profits made through self-dealing belong to the partnership. *In re Kohn's Estate,* 26 Misc.2d 659, 116 N.Y.S.2d 167, 172 (1952), *aff'd,* 282 App.Div. 1045, 126 N.Y.S.2d 897 (1953). One partner may not wrongfully appropriate partnership property. *Duncan v. Bruce,* 43 N.Y.S.2d 447, 179 Misc. 992, 993 (N.Y.Sup.Ct.1943).

### A. *Access to BCR's Books and Records*

Plaintiffs claim BCI and Brignoli breached their fiduciary and statutory duties by failing to provide access to BCR's books and records. Defendants claimed that Arie David, BCR's attorney, had arranged a meeting for an inspection. The defendants claimed that Jeffrey Zell, BCR's and BMI's accountant, was to meet with Robert Wishnew, CPA, the accountant for the plaintiffs and former accountant for BCR on June 6, 1988. The purpose of this meeting was to permit Wishnew, on behalf of the plaintiffs, to inspect BCR's books and records.

(Sweet, J.).

Wishnew testified no meeting was ever arranged by David or Zell. Further, Wishnew had not spoken to Zell regarding the meeting or an inspection of BCR's books and records. According to Wishnew, his only communication with David on this matter was a June 23, 1988, telephone conversation made over two weeks after the June 6th meeting was to have taken place. In that conversation, David stated Wishnew would be denied access to the books and records of BCR unless Brignoli was given access to Brick's books.

Zell testified that he "believed" he had spoken with Wishnew about a meeting prior to June 6, 1988 via telephone, but he could not recall what was said or who initiated the call.

The Court finds that a meeting was never arranged and Wishnew was never provided with access to BCR's books and records. Zell never attempted to reschedule the meeting and never inquired as to why Wishnew did not come to the meeting.

The Court finds the meeting arrangements were a sham orchestrated by David. This was a thinly veiled attempt to disguise the defendants' refusal to provide plaintiffs with access to BCR's books and records. Zell's testimony was evasive and not worthy of belief. Wishnew's evidence was thoroughly credible and believable.

All partners are entitled at all times to have access to and may inspect, partnership books and records. Del.Code tit. 6, § 17–305. BCI and Brignoli, breached their fiduciary and statutory duties to provide plaintiffs access to BCR's books and records.

### B. *Pledge by Brignoli of the BCR Certificate of Deposit For a Loan to BMI.*

■ Plaintiffs next claim Brignoli misappropriated BCR assets for his own benefit. Brignoli does not dispute that in 1988, he used a $175,000 certificate of deposit ("CD") owned by BCR to secure a bank loan for BMI without prior knowledge or authorization of the BCI board of directors.

Brignoli did not tell the bank officer of the purpose of the loan. Brignoli contends, however, (1) he was generally authorized to take such action under the Partnership Agreement[3] as the representative of the General Partner, BCI, and (2) that the purpose of the pledge and bank loan was to secure payment for "investigation" services that BMI rendered or was to furnish to BCR.

Neither alibi justifies Brignoli's clear breach of his fiduciary duties by misappropriating BCR's assets. Even assuming, *arguendo*, that the Partnership Agreement authorized Brignoli to pledge BCR's assets in general for bank loans, it seems ludicrous to postulate he was authorized to do so to BCR's detriment and to the benefit of himself and an entity in which he was personally interested and controlled; neither was "on behalf of the Partnership" as required by the Partnership Agreement.

Brignoli admitted on cross-examination that he obtained the $175,000 loan and the proceeds were used by BMI to pay BMI bills. The loan and security agreements were entered into after BMI had advanced $122,000 to an "unknown entity" at One Exchange Plaza, New York, NY—the same business address of Intervest, the entity chosen by Brignoli to execute BCR's trades after the dismissal of Brick. Although Brignoli claims the loan was not made to Intervest, Intervest is repaying the loan. The balance of the loan has never been repaid to the bank which continues to hold the CD as security. Brignoli's testimony was a patent attempted cover-up for a fraudulent act on his part.

The Court finds the Partnership Agreement did not authorize Brignoli to pledge the BCR CD. The pledge was in fact a misappropriation of the partnership's assets for the benefit of BMI. Such conduct constituted a breach of fiduciary duty owed by Brignoli and BCI to BCR, and Brignoli is liable to BCR for the amount required to repay the bank and release the CD to BCR.

---

**3.** Article 4.1(f) provides "the General Partner, in his sole and absolute discretion, shall have the full right, power and authority from time to time, and any time on behalf of the Partnership ... [t]o execute and deliver promissory notes, guarantees, agreements and other instruments."

### C. Payments to BMI for "Trading Audit Services" and "Trading Cost Analysis."

After Brignoli terminated Curley, Bennett and Brick in December, 1987, he engaged BMI to conduct several trading performance studies to "investigate" Brick's effectiveness in executing the trades called for by the BMI computer system. The fees BMI charged BCR for these alleged studies totaled approximately $500,000 or more which included $250,000 for the development of "Stock Sleuth," a computer program that was designed to measure the performance of stock traders by, *inter alia*, a comparing of the trades requested on the trading blotter versus the number of trades executed. However, Brick did trading for at least three other BMI licensees and BMI did not charge them for these services. Brignoli distinguished those cases by stating BCR was the only licensee he was responsible for and that BCR was also the money manager on the pension accounts.

Prior to December 1987, BMI had never been hired by anyone or shown any proficiency to do trading audit services. Brignoli hired BMI to render trading audit services disdaining to obtain a price quote from Abel Noser, SEI or any other qualified firm which regularly provides such services. Brignoli stated he did not obtain a cost estimate because these other firms could not adapt their software to Brignoli's specifications. Yet, two experts, including one called by the defendants, testified Stock Sleuth could be recreated fairly easily and inexpensively. The experts' price quotes ranged from $74,000 to $80,000 [4]. Brignoli in effect caused BCR to be charged by his controlled company, BMI, a total of $250,000 for the caper.

The hiring of BMI to render trading audit services was not formally presented to the BCI board of directors and it was not discussed with Curley. BMI carried out the services and billed BCR for the time spent on the project using a salary multiplier in excess of three times the salaries of BMI employees utilized in providing the services.

Brignoli justified the billing rates by stating Curley had approved the use of a salary multiplier in another circumstance when he approved the payment of certain production fees paid to BMI by BCR. Because the initial production cost agreement reached between Curley and BMI was not brought to the BCI board of directors for approval, Brignoli said he did not feel he was required to present the extraordinary and unusual "trading audit services" and "trading cost analysis" employment to the BCI board. Curley, however, was not financially connected to BMI, and independently approved the amount of the fees, the scope of the services, and the provider of the services, all in the usual course of business as an ordinary current incidental expense.

### D. Other Claims of Self-Dealing

Plaintiffs further claim Brignoli breached his fiduciary duty by (1) diverting BCR's trading operations to Intervest, an untried entity in which he has a substantial interest, (2) using BCR marketing staff to promote BMI products other than Excess Growth, and (3) placing BMI consultants and employees on the BCR payroll.

#### 1. Intervest

In October of 1987, Brignoli unilaterally decided to transfer some of Brick's trading duties to an entity called Intervest. Brignoli maintained that he had no financial interest in Intervest. However, in October of 1987, he began contemplating a business combination that would have resulted in BMI having a 25% ownership interest in both Intervest and a firm referred to as "Delta." One of Intervest's princi-

---

**4.** These estimates did not include the expense of formulating the parameters for the study. However, the fact that Brignoli hired BMI without obtaining BCI's approval or outside estimates constitutes a breach of fiduciary duty. Such self-dealing is prohibited if not fully disclosed and authorized, regardless of whether it may be "fair" to the partnership. *See* A. Bromberg and L. Ribstein, *Bromberg and Ribstein on Partnership* § 6.07(b) (1988) ("If there is no informed consent, the mere fact that the transaction is fair to the partnership may be insufficient to validate it.").

pals, Jeff King, was one of the principals of Delta.

Brignoli was still contemplating this arrangement when he fired Curley and Brick and later hired Intervest. Brignoli also personally loaned $500,000 to King for Delta's use, caused BMI to make a loan of $122,000 that Intervest was repaying, and caused BMI to secure a lease on office space that it sublet to Intervest and Delta.

Brignoli's financial interest, albeit a non-equity one, in Intervest and other related entities was substantial. Testimony at trial thus indicated Brignoli abused his position with BCR by replacing Brick with Intervest as part of a larger plan to "freeze out" the plaintiffs from a business they started, built from scratch and from which they had only begun to receive substantial benefit. Such a motivation stamps the actions of Brignoli and BCI as evidence of conduct in bad faith.

**2. Marketing of BMI Products Using BCR Personnel**

Testimony showed that in June of 1987, Brignoli asked Roberts, then head of marketing at BCR, to assist him in setting up the marketing effort for Volatility Capture System, a program similar to Excess Growth which was developed and marketed by Brignoli Advisors, another Brignoli-affiliated money management vehicle. Roberts refused, asserting that no benefit from this new program would accrue to BCR. In February of 1988, Brignoli told Roberts to "coordinate" his marketing efforts with Bill Morris, the marketing director at Brignoli Advisors. Again, Roberts refused. Roberts was fired the next month.

Bruce Kerr, Roberts' replacement at BCR, was originally hired to market Volatility Capture for Brignoli Advisors. Kerr stated that when he makes marketing calls on behalf of BCR, he "pitches" both Volatility Capture and Excess Growth to prospective clients, although Excess Growth is the "main thrust" of the presentation.

Annette Borenstein, a BCR marketing associate, was also originally hired by Brignoli Advisors. After Roberts was fired by Brignoli, Borenstein was transferred to the BCR payroll. At BCR she continued to complete investment advisor questionnaires for BMI.

It appears from the trial testimony that Brignoli's desire to successfully market Volatility Capture led him to misappropriate BCR's marketing resources for the benefit of his other company, Brignoli Advisors. Roberts had successfully marketed Excess Growth and Brignoli knew Roberts' assistance could lead to success for Volatility Capture. When Roberts refused, Brignoli demanded "coordination" of efforts to avoid embarrassment and confusion with prospective clients. However, this coordination included the sharing of the names of prospective clients and Roberts' plans for selling Excess Growth to them.

When Roberts refused to "play along" with Brignoli's game, he was fired and Brignoli assumed control of marketing for both products with all the attendant conflicts of interest. Again, the formerly active limited partners of BCR were the victims of a "freeze out," in this instance, designed to wrongfully exploit BCR's marketing system—another instance of bad faith attributable to Brignoli and BCI through him.

**3. BMI Staff on the BCR Payroll**

The plaintiffs alleged and proved that after Brignoli successfully completed the "freeze out," BCR became a haven equipped with machinery to turn out benefits for himself, friends, family, BMI employees and shareholders.

After Brignoli fired Curley, Brignoli caused BCR to pay huge amounts to BMI for additional production services not covered in the BCR/BMI licensing agreement. Curley had previously negotiated for production payments of approximately $26,500 per month. Once Curley left BCR, BMI retroactively increased the costs billed to approximately $82,000 per month. No one at BCR negotiated the terms of the additional production fees; they were unilaterally set in place by Brignoli and BMI.

Brignoli also caused BCR to hire BMI employees at inflated rates to perform rou-

tine back office work for BCR. When two key back office staff members of BCR left in June of 1988, Brignoli "discovered a mess" in the BCR back office dating back six to nine months. Brignoli placed the blame for this "mess" on Curley even though Brignoli had been in charge of BCR for six months. Rather than simply hiring permanent BCR clerical staff to replace the departed BCR employees, Brignoli replaced them with BMI personnel and billed BCR for their services using a salary multiplier in excess of three times their actual BMI salaries. Brignoli testified the BCR back office now runs more efficiently and that the current average monthly BCR back office costs are comparable to the average monthly back office costs under Curley's tenure. However, BCR now has only approximately $500,000 under management whereas under Curley, BCR had managed in excess of $1.2 billion.

At the same time, Brignoli increased his own wages paid by BCR. In 1988, Brignoli placed himself on the BCR payroll at a salary of $250,000 per year while still receiving a $175,000 salary for a second full-time position at BMI. Curley's contract only called for a salary of $150,000 per year from BCR. Brignoli testified he himself directed the amount of his salary as compensation for the work he performed in Curley's place after Curley was fired.

The trial testimony, however, showed that in 1988 Brignoli visited only one potential client of BCR and met with prospective clients in BCR's offices on two or three occasions. Testimony also showed he was largely ignorant of the day-to-day operations which Curley had formerly supervised. He remained unaware of BCR's billing practices and general financial affairs. Moreover, Curley previously received only $150,000 per year from BCR for actively overseeing BCR's operations and Curley did not hold a second full-time position at the same time.

Brignoli further directed BCR to pay a whole host of BMI employees and consultants for work performed for BMI, if at all. He had BCR pay a $50,000 advance retainer to Arie David, a BMI shareholder and outside counsel to BMI and attorney for Richard Brignoli, to be applied to future billings. No hourly accounting to support billings was supplied to BCR or submitted on this record by David. BCR paid David the retainer and David's firm in addition charged BCR over $25,000 for work on a summary judgment motion that was never filed at that time; the "retainer" was never applied to those billings.

Joseph Debe, Brignoli's uncle, provided consulting services to BMI and had received approximately $50,000 per year for such services. In 1988, Brignoli placed Debe on the BCR payroll without Debe's knowledge at a salary of $100,000 per year. After the transfer, the services Debe provided were not altered. Debe testified he asked to be removed from the BCR payroll when he learned of the transfer, in part because he "didn't want or need" to be put on the payroll.

Brignoli also hired his "old sailing buddy" Robin Cotterell to do accounting work at BCR for $75,000 per year. Brignoli justified Cotterell's employment by stating Cotterell automated BCR's financial reporting system. Brignoli also testified, however, he had to fire Cotterell when he later discovered that Cotterell had charged large amounts of unauthorized personal expenses to BMI.

Robert Ince had been a consultant to both BCR and BMI. Prior to 1988, Ince had billed each entity separately for the services he rendered. After Brignoli assumed control of BCR, Ince testified that Brignoli directed him to bill BCR for all services rendered without regard to which entity received the benefit of his work.

Curley had refused to pay consulting fees to Professor Harry Markowitz. When Brignoli assumed control of BCR, he approved payment of $3,000 per month in consulting fees to Markowitz.

When viewed in concert these acts provide mounting evidence of the degree of abuse and self-dealing in conducting BCR's affairs that Brignoli imparted during his tenure at BCI. This limited partnership whose continued existence depended on the good faith and fair dealing of the General

Partner, has furnished the Court every reason for terminating the General Partner's tenure.

### IV. *Affirmative Defenses*

 Defendants defend their conduct by counter-accusations that plaintiffs have come before the Court with purportedly unclean hands. They assert plaintiffs have committed numerous securities, ERISA, and other statutory violations and breached their fiduciary duties to the clients of BCR primarily by engaging in cross-trading,[5] by failing to inform BCR's clients and the government of such cross-trading, by failing to keep proper records and falsifying other statutorily-required records pertaining to their cross-trading, by trading for personal accounts on inside information of what the clients were buying and selling, and by forming Cornerstone to compete with BCR for the provision of money management services.

In so arguing, the defendants misinterpret the thrust of the clean hands doctrine:

> The rule is that unrelated bad conduct is not to be considered against the plaintiff. It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claims, that he is to be barred because of his conduct. "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts. * * *"

D. Dobbs, *Remedies* § 2.4 at 46 (1973) (quoting *Republic Molding Corporation v.*

*B.W. Photo Utilities*, 319 F.2d 347 (9th Cir.1963)).

Defendants have failed to demonstrate that plaintiffs' actions were somehow "the source of" defendants' clear violations of their fiduciary duties.[6] Plaintiffs acquired their rights against the defendants not through any misconduct on their own part, but by their mere status as limited partners of an entity which defendants have mistreated and abused. Moreover, the Partnership Agreement specifically provides that limited partners may engage in competing activities.[7]

 Defendants next argue plaintiffs lack standing to bring suit "on behalf of" BCR, and have failed to fulfill the statutory requirements for bringing their derivative claim by failing to first demand relief from BCR.

A limited partner may bring an action on behalf of the partnership to recover a judgment in its favor if the general partners with authority to do so have refused or if an effort to cause those general partners to bring the action would not likely succeed. Del.Code tit. 6, § 17–1001. The complaint must set forth with particularity the effort of the plaintiff to secure initiation of the action or the reasons for not making an effort. *Id.* § 17–1003.

Paragraph 16 of plaintiffs' complaint states:

> Given the refusal by BCI to comply with the statutory obligation to provide access to the partnership's books and records

---

5. Cross-trading is where one broker represents both the buyer and the seller of a security and executes both the purchase and the sell side of the transaction, and receives a commission for both.

6. Brignoli contended at trial that his pledge of BCR's certificate of deposit for a bank loan to BMI and BMI's performance of the trading investigation services were "caused" by the trading improprieties committed by Brick and Bennett in concert with the plaintiffs. However, Brignoli failed to obtain approval and a resolution of BCI's board before so acting. And the idea that plaintiffs somehow "caused" Brignoli to pledge BCR's certificate of deposit is ludicrous, especially given Brignoli's testimony that BMI's counsel, Arie David, had advised him not to do it.

7. Section 4.4 of the Partnership Agreement provides:

> "[N]either this Agreement nor any activity undertaken on behalf of the Partnership shall prevent the Limited Partners from engaging in any other activities or businesses or from making investments, whether or not such activities, businesses or investments are similar in nature to the business of the Partnership, whether individually or jointly with others, without any obligation to account to the other Partners for any profits or other benefits derived therefrom, and without having to offer an interest in such activities, businesses or investments to the other Partners.

... as well as other refusals to provide information, a demand upon BCI to redress the breaches of fiduciary duty complained of herein would be futile.

Plaintiffs have clearly set forth why an effort to cause BCI to bring such an action would not likely succeed. They have also included in the complaint their reasons for not making such an effort. Therefore, the statutory requirements for bringing the derivative claim have been met.

Moreover, the statute by its terms does not indicate the plaintiffs must somehow show their moral worthiness to bring suit in their derivative capacity. Defendants, without citing authority for the proposition, argue plaintiffs may not bring suit on behalf of BCR in light of their participation in Cornerstone, a money management enterprise which allegedly competes with BCR. Such activity is neither prohibited by the Partnership Agreement nor by statute. Plaintiffs have fulfilled the statutory requirements for bringing a derivative suit against Brignoli for misappropriation of assets and damages, and they may do so.

■ Defendants next contend the BCR Partnership Agreement exempts their good faith conduct from liability unless the conduct constitutes "gross negligence, willful misconduct or recklessness." This argument simply misreads the terms of the Partnership Agreement, which provides:

4.3 *Indemnification of General Partner.* The General Partner shall not be liable to the Partnership or to any Limited Partner for any act or omission in good faith and within the scope of the authority conferred by this Agreement. The Partnership shall indemnify and save harmless the General Partner from and against any and all liability, loss, cost, expense or damage incurred or sustained in the conduct of the business of the Partnership within the scope of the authority conferred by this Agreement; provided, however, that the General Partner shall not be entitled to any indemnification in the event any such liability, loss, costs, expense or damage is incurred or sustained as a result of the

General Partner's gross negligence, willful misconduct or recklessness.

By its terms the Agreement provides that BCR will *indemnify* BCI unless BCI acts willfully or recklessly; it does *not* provide that the limited partners may not successfully recover damages directly from BCI or Brignoli for misconduct which was merely negligent. The Agreement only exempts conduct performed "in good faith" and "within the scope of the authority" of the Partnership Agreement. Since defendants' conduct was neither performed in good faith nor within the scope of the authority conferred by the Agreement, see discussion *infra*, the plaintiff limited partners may properly bring suit against them.

Defendants' remaining affirmative defense—that the payments to BMI were necessary and reasonable—and the Second, Third and Sixth Counterclaims against plaintiffs and Roberts are precluded by virtue of the jury verdict rendered in favor of Brick and Bennett on the claims which overlap those now asserted against plaintiffs and Roberts.

■ The counterclaim complaint based the overlapping claims primarily on allegations that Brick failed to execute the "vast majority" of trading requests on the trading blotter, and that Curley and Bennett failed to properly supervise Brick's trading. The pre-trial order submitted and signed by defendants' counsel on the jury claims further stated Bennett, Brick, Curley, Roberts and Karanfilian "acted in concert" to breach their fiduciary duties to BCR, and that Bennett and Brick's failure to trade the requested securities and their alleged use of knowledge of the merchandise which BCR's client were trading were done "with the understanding and knowledge of Curley, Karanfilian, and Roberts." The counterclaim plaintiffs presented evidence, and the jury was instructed, on each of these allegations. The jury returned a verdict in favor of Brick and Bennett.

The defendants are bound by the jury's resolution of the counterclaims against Brick and Bennett which are also material to the equitable claims asserted by plaintiffs. *Beacon Theatres, Inc. v. Westover,*

359 U.S. 500, 508, 79 S.Ct. 948, 955, 3 L.Ed.2d 988 (1959). And to the extent the counterclaims were resolved against BCI and Brignoli, the judgment thereon may be used under the doctrines of *res judicata* or *collateral estoppel* to preclude the additional counterclaims BCI and Brignoli have asserted against plaintiffs and Roberts for their alleged misconduct while acting in conjunction with Brick and Bennett. *N.L. R.B. v. United Technologies Corp.*, 706 F.2d 1254, 1259, 1260 (2d Cir.1983) (Kearse, J.). This effectively disposes of defendants' "necessary and reasonable" defense as well as the Second, Third, and Sixth Counterclaims lodged against plaintiffs and third-party defendant Roberts. The remaining counterclaims—for breach of contract against Curley and defamation and trade disparagement against Curley and Roberts—may be tried in connection with a partnership accounting. *See Mack v. White*, 35 Del. 289, 165 A. 150 (Del.Sup.Ct. 1933).

### V. *Relief Granted*

▮ The Delaware Revised Uniform Limited Partnership Act provides:

> On application by or for a partner the Court ... may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement.

Del.Code tit. 6, § 17–803.

The Delaware Uniform Partnership Act further provides that the Court may order a dissolution as provided by statute when, *inter alia,* (1) a partner "has been guilty of such conduct as tends to affect prejudicially the carrying on the business", (2) a partner "so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him", or (3) "other circumstances may render a dissolution equitable". Del.Code tit. 6, § 1532.

These "other circumstances" include such infractions as breach of fiduciary duty, *May v. Flowers*, 483 N.Y.S.2d 551, 106 A.D.2d 873 (N.Y.App.Div.), *appeal dismissed*, 64 N.Y.2d 611, 491 N.Y.S.2d 1025, 480 N.E.2d 749 (1985), misappropriation of

assets, *Duncan v. Bruce*, 43 N.Y.S.2d 447, 179 Misc. 992, 993 (N.Y.Sup.Ct.1943), and refusal to permit the inspection of the books, records or documents. *Susman v. Venture*, 70 Ill.Dec. 269, 274, 449 N.E.2d 143, 148, 114 Ill.App.3d 668 (1982).

The extreme level of gross misconduct and arbitrary management of BCI's affairs willfully committed by Brignoli in his capacity as majority shareholder of BCI indicates it is not reasonably practicable to carry on the business of BCR with BCI remaining as the General Partner. The Court concludes BCI's presence as General Partner poses a serious and immediate threat of further misappropriation of BCR funds and of further *ultra vires* acts.

Defendants, however, have strenuously argued against immediate dissolution of the partnership as a going concern. Under its inherent equitable powers the Court concludes BCI is legally incapable of performing its statutory duties as the General Partner of BCR fairly and in good faith, and therefore grants plaintiffs' more limited request for removal of BCI as the General Partner, and will appoint an interim receiver until such reasonable time as a majority of the limited partners exclusive of BMI vote to continue the partnership and appoint one or more new General Partners as successor to BCI. *See* J. Crane, *Handbook on the Law of Partnership* (1952) p. 418 ("In a business trust [defined as analogous to a limited partnership], fraudulent or other seriously improper conduct on the part of the trustees [general partners] may be a sufficient reason for their removal by a court of equity, but it is not necessary that the trust be wound up."); *May v. Flowers, supra,* 483 N.Y. S.2d at 553, 106 A.D.2d 873 (action of general partner and limited partner in assigning equipment lease to the partnership in return for partnership's assumption of lease obligations made by the general and limited partner to the other limited partner was breach of fiduciary duty warranting expulsion of general partner and limited partner from partnership, dissolution of

partnership, and rescission of assignment).[8]

The vote of the limited partners shall be carried out according to the terms of the Partnership Agreement, which provides:

> If the General Partner [BCI] shall withdraw or retire after August, 1987 ... then the General Partner or its legal representative shall promptly notify the Limited Partners thereof and shall dissolve the Partnership, unless a majority in interest of the Limited Partners, exclusive of Brignoli Models, Inc., shall desire to continue the Partnership and appoint one or more new general partners as successor to the General Partner.

Article VI, Section 6.1(b).

If the limited partners decide to continue the Partnership, they shall appoint a new General Partner as further provided by Section 6.1(b) of the Partnership Agreement. If they do not so vote to continue the Partnership, it shall be dissolved, an accounting shall be had, and its affairs wound up pursuant to Sections 17–801 and 17–802 of title 6 of the Delaware Revised Uniform Limited Partnership Act and sections 7.1 through 7.4, inclusive, of the Partnership Agreement.[9]

BMI will be enjoined from voting its interest in BCR for the selection of a successor General Partner if the limited partners vote to continue the Partnership, or for the selection of a liquidating trustee if the limited partners vote to dissolve the partnership under section 7.2 of the Partnership Agreement.[10] In the event of default of the limited partners' in selection of a liquidating trustee upon a vote for dissolution of the partnership, the Court will appoint a liquidating trustee to wind up the partnership affairs.

The Court further awards, on plaintiffs' derivative claim for relief, damages to BCR, the nominal party-defendant, against defendant Richard Brignoli in the amount of $175,000 or such amount as is necessary to be paid to Republic National Bank of New York to release the converted CD belonging to BCR.

The "counterclaims" against plaintiffs and Roberts which are not precluded by the judgment on the jury's verdict may be pursued either by the new BCR General Partner or the liquidating trustee within the context of a proceeding for an accounting.

Accordingly, an interlocutory judgment providing for relief set forth above shall be entered herein. A proposed form of such judgment shall be submitted on or before August 16, 1989, on five days' notice.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

SO ORDERED.

---

**8.** Upon removal of BCI as the General Partner of BCR, the BCI Shareholders Agreement will also be terminated automatically under Section 5(b) of that agreement.

**9.** Section 17–802 provides:
> On application by or for a partner the Court of Chancery may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement. Delaware Code, tit. 6, § 17–802 (1985 Interim Supp.).

Section 17–801 further provides that upon entry of a decree of judicial dissolution under § 17–802 or upon withdrawal of a general partner, "[a] limited partnership is dissolved and its affairs shall be wound up." *Id.* § 17–801.

**10.** Section 7.2 of the Agreement provides in relevant part:
> *Liquidating Trustee.* Upon dissolution of the Partnership, the liquidating trustee (which shall be the General Partners, unless all general partners are the subject of one of the events set forth in subsection (a) of Section 7.1 [including legal incapacity or withdrawal of the General Partner], in which case a person selected by a majority in interest of the Limited Partners shall be the liquidating trustee) shall proceed diligently to wind up the affairs of the Partnership and distribute its assets to the Partners in accordance with their respective capital accounts.